# In the United States Court of Federal Claims

No. 02-173 X

(Filed: April 15, 2004)

| | | |
|---|---|---|
| J.L. SIMMONS COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * * * * * * * * * * * | Congressional reference case; Legal versus equitable claim; Wrongful or negligent conduct; Gratuity; Alleged defective procedures used by VA Board in resolving pre-Contract Dispute Act contract claim; Pre-judgment interest; Other interest; Litigation expenses; Interest and expenses determined to be a gratuity; Impact of referring legislation. |

**REPORT**

*Christopher M. McNulty,* King & King, Falls Church, Virginia, for plaintiff.

*Brian Spencer Smith,* U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Kiesler*, for defendant

**ALLEGRA, Hearing Officer:**

The seeds for this congressional reference case were sown in 1949, when the Veterans' Administration (VA) supplied its contractor, J.L. Simmons (plaintiff), with defective specifications for the foundational piles underlying a VA hospital to be built in Chicago. From this root error a series of contract claims eventually blossomed. It took the better part of twenty years for J.L. Simmons finally to harvest these claims, but when the Court of Claims ultimately ruled in plaintiff's favor, it, nonetheless, was compelled to dismiss plaintiff's request for interest. *See J.L. Simmons Co., Inc. v. United States*, 412 F.2d 1360, 1361 (Ct. Cl. 1969) (*J.L. Simmons*). No interest was provided because the Contract Disputes Act of 1978, 41 U.S.C. §§ 601, *et seq.,* had not yet been enacted and no statutory provision then allowed for the accrual of interest on a government contract claim. Three more decades passed.

Then, on December 20, 2001, this matter revivified, when the United States Senate passed Senate Resolution 83, referring S. 846 to the Chief Judge of this court with instructions that he report back to the Senate "such findings of fact and conclusions as are sufficient to inform Congress of the nature, extent, and character of the claim for compensation referred to in such

bill as a legal or equitable claim against the United States, or a gratuity; and . . . the amount, if any, legally or equitably due from the United States to J.L. Simmons." By way of further information, Section 1 of S. 846 provides:

> The Secretary of the Treasury shall pay J.L. Simmons Company, Inc., of Champaign, Illinois, out of any money in the Treasury not otherwise appropriated, a sum of money, in an amount to be determined by the United States Court of Federal Claims, representing the amount to which J.L. Simmons Company, Inc., may be entitled in order to make J.L. Simmons Company, Inc., and any of its subcontractors, whole for any litigation expenses, and any interest, due and owing to J.L. Simmons Company, Inc., and any of its subcontractors, and not otherwise recoverable at law, on account of the construction of the Veterans Administration (West Side) Hospital in Chicago, Illinois, during the period of 1949 through 1954, and the litigation of claims resulting therefrom.

Pending before this judge, acting as a hearing officer, is plaintiff's motion for a favorable report and defendant's cross-motion (opposition) thereto – together akin to cross-motions for summary judgment.[1] For the reasons that follow, the undersigned concludes that any payment to plaintiff would be a gratuity.

## I. FACTS[2]

As noted, this case has an extensive history that spans a half of century. A detailed summary of much of that history may be found in the Court of Claims opinion in *J.L. Simmons*, the factual findings of which largely track those that follow.

On or about October 5, 1949, J.L. Simmons Company, Inc. received a contract to construct a hospital and related facilities for the VA in Chicago, Illinois. The contract price was $6,985,905. The completion date listed was September 18, 1951; work actually was completed on April 30, 1953. The contract specifications were "design" specifications that set forth, in detail, the materials to be used and the manner in which the work was to be performed; plaintiff was not permitted to deviate from these specifications. The specifications for the pile foundation required cast-in-place, concrete-type piles cased with a steel shell, and were to be one of three designated types (*e.g.*, pedestal). The specifications indicated the load bearing capacity for the various piles and provided that one pile of each type was to be tested prior to the commencement

---

[1] Summary judgment is a mechanism that may properly be used in a congressional reference. In this regard, paragraph 1 of Appendix D to the Rules of the Court of Federal Claims provides that "[t]he RCFC, to the extent feasible, are to be applied in congressional reference cases." *See also Barlow v. United States*, 51 Fed. Cl. 380, 392-93 (2001).

[2] Defendant has essentially stipulated to the facts underlying plaintiff's claim, including those stated in *J.L. Simmons, supra*.

of the pile driving operations. Certain limitations upon the settlement of the piles had to be met in order to pass the test. The contract further set forth, with specificity, the pile driving equipment to be employed and the procedures for their use.[3] Plaintiff hired MacArthur Concrete Pile Corporation (MacArthur) to perform this work as its subcontractor.

Problems with the pilings ensued and persisted. Because various events here overlap in time, the problems with the pilings are perhaps best described not sequentially, but in conjunction with the five claims that plaintiff eventually pursued:

– **Claim 1**. In late 1949, MacArthur drove and then tested various types of piles specified in the contract. None of them met the settlement limitations prescribed by the specifications. Seeking a substitute, the VA ordered plaintiff to install six additional test piles of varying types. Believing these test piles exceeded those required by the contract, plaintiff filed a claim for additional compensation (Claim 1), which, on February 23, 1951, was denied by the contracting officer.

– **Claim 2**. Meanwhile, after conducting tests, the VA determined that a composite-type pile would work. It drafted specifications for such a pile – as detailed as those in the original contract – and then sought to substitute those specifications into the contract. The VA rejected plaintiff's cost proposal for accomplishing this and, on March 7, 1950, instead unilaterally directed plaintiff to proceed with the revised foundation work, with an adjustment of price and time to be determined at a later date. But, it was not until March 13, 1953, long after the foundation of the building was completed, that the VA finally issued a change order allowing $151,633 and a 56-day time extension for the switch in pile type. Plaintiff deemed this allowance inadequate, giving rise to a second claim (Claim 2).

– **Claim 3.** Now, the composite-type piles did not entirely work either. On June 28, 1950, plaintiff detected movement in some of the thousands of piles MacArthur had already driven. Plaintiff repeatedly requested instructions from the VA on how to proceed, but was told to finish driving the remaining 366 piles for the hospital building without changing the required driving method. Yet, during this period, the VA began to reject previously installed

[3] Overall, regarding these specifications, the Court of Claims concluded that "[i]n summary, these were specifications of the type which have traditionally been held to carry with them the implied warranty by the party preparing them that if followed, a satisfactory result will pertain." *J.L. Simmons*, 412 F.3d at 1363.

piles and suggested that plaintiff perform exploratory work to determine the extent of the problems with the foundation. Plaintiff apparently conducted this survey, despite disclaiming responsibility for the foundation problems. As a result of these problems, work on the project was slowed, periodically grinding to a halt, until September 26, 1950, when the VA issued instructions to correct 42 of the piles. The VA directed plaintiff to proceed with the extensive corrective work, disclaiming responsibility and threatening termination for default if plaintiff did not proceed immediately. Plaintiff proceeded, albeit under protest. Delays for restoration continued until April 30, 1951. Plaintiff and its subcontractors filed a third claim (Claim 3) for the additional costs of restoring the damaged foundations and for the delays that resulted from the foundation problems. On February 23, 1951, the contracting officer denied that claim.

– **Claim 4**. On December 17, 1953, plaintiff requested time extensions totaling 535 calendar days, consisting of 366 days for the foundation difficulties and 169 days for unrelated changes. The contracting officer did not respond directly to this request, but instead issued a series of change orders allowing plaintiff 534 calendar days, all of which were ascribed to causes unrelated to the foundation. Plaintiff appealed these change orders (Claim 4), claiming that the failure properly to attribute the extension to the foundation had a monetary impact on its Claim 3.

– **Claim 5**. Finally, on May 5, 1954, the contracting officer deducted from monies otherwise due plaintiff the sum of $6,500 for the cost of engineering services rendered to defendant by a private consultant to overcome the problem with pile movement. This dispute became Claim 5.

Ultimately, plaintiff thus perfected five claims relating, in varying ways, to the problems encountered with respect to the piles – none of which were allowed.

Plaintiff, in turn, appealed each of these matters to the VA's Construction Contract Appeals Board (the Board). In 1955 and 1956, plaintiff was permitted to appear and present witnesses before the Board. Under the procedure then in place, the Board acted in an advisory capacity to the VA's Assistant Administrator for Construction, who actually was empowered to decide contract appeals. Although plaintiff's witnesses were examined and cross-examined before the Board, the VA presented no live witnesses. Instead, following the conclusion of plaintiff's presentation, the Board received written reports from a VA official and two outside engineers – plaintiff was not permitted to confront or cross-examine these witnesses. Moreover,

it appears that the same person, Mr. W.G. Harding, represented the VA as an advisor to the contracting officer and then prepared the Board's decision. On February 12, 1959, the Board issued a decision, later supplemented by a decision dated March 27, 1959, allowing Claim 4, partially allowing Claims 1, 2, and 5, and denying Claim 3. These decisions were adopted and approved by the Assistant Administrator for Construction on February 20, and March 31, 1959, respectively. Under these decisions, the VA allowed plaintiff $323,291.71 out of a total claimed amount of $1,498,299.36.

Following the Board's decision, J.L. Simmons filed a petition with the Court of Claims on April 23, 1959. In that petition, plaintiff claimed, *inter alia*, that the Board's decision "was a travesty upon administrative justice and fair play, or was arbitrary, or capricious, or so grossly erroneous as to imply bad faith, or not supported by substantial evidence." *J.L. Simmons*, 412 F.3d at 1368. The case went through a series of intermediate rulings, complicated, as the Court of Claims noted in its opinion, by the fact that it –

> straddled in point of time the *Wunderlich* case, the Congressional reaction thereto culminating in the Wunderlich Act, [68 Stat. 81 (1954),] and the three occasions in *Bianchi*, *Utah*, and *Grace*, on which the Supreme Court undertook to review that Act, and its relationship to the Tucker Act jurisdiction of this court.

*Id.* at 1368-69 (footnotes omitted).[4] Sorting through these issues, on June 30, 1966, the Court of Claims issued an order suspending proceedings in order to provide the Board an opportunity to remedy defects and inadequacies, reconsider J.L. Simmons' appeals, and render a new decision. On May 31, 1967, after conducting very extensive hearings that included full examination of all witnesses, the Board issued a second decision, finding in plaintiff's favor in the amount of $617,791.57, and returned the decision to the Court of Claims for further review.

On July 27, 1967, as previously ordered, plaintiff filed an amended petition with the Court of Claims. At least two motions for partial summary judgment subsequently were filed, the first of which led to a stipulated judgment for plaintiff on Claim 2, and the second of which was referred to Commissioner Louis Spector for recommendations for conclusions of law. Commissioner Spector filed his report on January 21, 1969, and after further briefing, the Court adopted his opinion and recommended conclusions with certain modifications. Critically, the Court found that the government was responsible for the foundation failure because of the

---

[4] The quartet of cases referenced in this quote are *United States v. Wunderlich*, 342 U.S. 98 (1951); *United States v. Carlo Bianchi & Co., Inc.*, 373 U.S. 709 (1963); *United States v. Utah Const. & Mining Co.*, 384 U.S. 394 (1966) and *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424 (1966). These cases, and the Wunderlich Act itself, focused on the nature and extent of the Court of Claim's review of cases involving contract claims and, in particular, the amount of deference that should be attributed to the fact findings of administrative bodies. *See, e.g., Chandler v. Roudebush*, 425 U.S. 840, 862 & 862 n.37 (1976) (discussing these cases and the Wunderlich Act).

defective specifications. *Id.* at 1375. Consequently, the Court determined that plaintiff was entitled to delay damages for the problems encountered with respect to the foundation, with the amount to be determined in further proceedings. *Id.* at 1381-83.[5]

In its amended complaint, plaintiff also sought interest on the claimed amounts, arguing that the Board's original proceedings were so defective as to constitute a taking under the Fifth Amendment, thereby paving the way for the recovery of interest as just compensation. The Court rejected this claim, noting initially that "[u]nfortunately for plaintiff in this case, his theory that subnormal administrative procedures can amount to a 'taking,' must be measured against the standards that prevailed at that time," which the Court noted required less from agencies in terms of procedure. 412 F.2d at 1389. By way of further explanation, the Court, referring to its decision in *Acme Process Equipment Co. v. United States*, 347 F.2d 509 (Ct. Cl. 1965), *rev'd on other grounds*, 385 U.S. 138 (1966), opined:

> The claim for interest could not be sustained if it were predicated solely on the Government's failure to pay money when it was due. Recognizing this, plaintiff's counsel lays heavier emphasis on bad faith underlying the administrative procedures as equivalent to the taking of a contract right, which is undoubtedly a property right, and he cites the *Acme* case as inferring that a finding of bad faith would have produced a different result in that case. But *Acme* did not hold that bad faith in the administrative procedures would constitute a taking contrary to the fifth amendment. It stated rather that '[w]e do not reach the issue of whether there would be a taking * * * if bad faith on the part of the defendant had been shown.'
>
> The cases are lacking to support a holding that the defective procedures described above constituted a taking, and the inferences of *Wunderlich*, the Wunderlich Act, and *Bianchi* are to the contrary.

*J.L. Simmons*, 412 F.2d at 1389 (citation omitted). Based on the foregoing, the court concluded that "[p]laintiff is not entitled to prevail on this claim for interest." *Id.*

As previously described, this matter has now been referred by the United States Senate to this court, to be handled in accordance with 28 U.S.C. § 2509 (2000). Following the referral, plaintiff filed a complaint in this court seeking recovery on three counts: First, it seeks prejudgment interest on the $650,000 it received in 1970 for the added work and delays. This

---

[5] On August 20, 1970, the parties entered into a stipulation of settlement with respect to the delay damages, which had been remanded to Commissioner Spector for determination of the amount of recovery due J.L. Simmons. Commissioner Spector recommended that judgment be entered in J.L. Simmons' favor in the amount of $650,000. On August 31, 1970, the Court entered such judgment.

interest totals $1,034,799.91, and was calculated using the various prime rates applicable between the date plaintiff submitted its claims to the VA and the date payment was made. Second, J.L. Simmons seeks reimbursement for the costs, expended through 1970, of legal counsel and expert consultants retained to pursue additional compensation and monies from the government and to defend claims by subcontractors, in the amount of $191,726. Finally, it asseverates that the interest and litigation expenses described above should be adjusted to reflect the current value of the $1,226,525.91, up until December 2001, when the Senate referred the matter to this court, which plaintiff claims entitles it to an additional $3,126,046.59. Plaintiff avers that all three counts represent equitable claims owed by the United States, entitling it to a final sum of $4,352,572.50. While defendant essentially admits plaintiff's factual allegations, it, nonetheless, asserts that the complaint in question does not present any equitable claims, but instead requests what should be deemed a gratuity.

## II. DISCUSSION

As the referring legislation here reflects, in a congressional reference case, the court is statutorily obliged to inform the Congress "whether the demand is a legal or equitable claim or a gratuity." 28 U.S.C. § 2509(c) (2000). At the outset, a few words distinguishing legal and equitable claims from gratuities are warranted – fortunately, that path has been well-marked.

"A legal claims arises when there is a violation of substantive law." *Martin v. United States*, 37 Fed. Cl. 86, 90 (1996). Such a claim has been defined more extensively, thusly –

> the words "legal claim" as used in the congressional reference statute imply no special meaning beyond the conventional understanding of that term: a claim based on the invasion of a legal right, that is "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege."

*Spalding & Son, Inc. v. United States*, 28 Fed. Cl. 242, 247 (1993) (quoting *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137-38 (1939)); *see also Banfi Prods. Corp. v. United States*, 40 Fed. Cl. 107, 121 (1997); *INSLAW v. United States*, 35 Fed. Cl. 295, 302 (1996). To qualify as a legal claim, the claim must be viable in all terms – for example, it must not be barred by the applicable statute of limitations or by some other sovereign immunity defense. *See Kanehl v. United States*, 40 Fed. Cl. 762, 771 (1998); *INSLAW v. United States*, 39 Fed. Cl. 307, 327-29 (1997).

Equitable claims do not partake of the latter limitation. *Kanehl*, 40 Fed. Cl. at 771; *INSLAW II,* 39 Fed. Cl. at 327-29; *White Sands Ranchers v. United States*, 14 Cl. Ct. 559, 565 (1988). Rather, they arise from "an injury occasioned by Government fault" when there is "no enforceable legal remedy – due, for example, to the bar of sovereign immunity or the running of the statute of limitations." *Kerr-McGee Corp. v. United States*, 36 Fed. Cl. 776, 786 (1996) (quoting *White Sands*, 14 Cl. Ct. at 565); *see also Bear Claw Tribe, Inc. v. United States*, 36 Fed.

Cl. 181, 186 (1996). Under the prevailing view, in order to recover on an equitable claim, the plaintiff must show two things: that "the government committed a negligent or wrongful act" and that "this act caused damage to the claimant." *Cal. Canners & Growers Assoc. v. United States*, 9 Cl. Ct. 774, 785 (1986); *see also*, *e.g.*, *Banfi*, 40 Fed. Cl. at 121-22; *Sneeden v. United States*, 33 Fed. Cl. 303, 309 (1995); *Land v. United States*, 29 Fed. Cl. 744, 752 (1993); *Spalding*, 28 Fed. Cl. at 250; *Sea-Gate, Inc. v. United States*, 4 Cl. Ct. 25, 30 (1983); *Shane v. United States*, 3 Cl. Ct. 294, 304 (1983); *but see G.E. Amick v. United States*, 5 Cl. Ct. 426, 430 (1984).

What is wrongful or negligent action under this standard? As noted above, wrongful conduct carries with it an element of fault. *Kanehl v. United States*, 38 Fed. Cl. 89, 98 (1997); *Kerr-McGee Corp*., 36 Fed. Cl. at 786; *Bear Claw Tribe*, 36 Fed. Cl. at 186. It thus entails more than a mere error or questionable exercise of government discretion; rather, there must be some violation of a standard of conduct established by statute or regulation or a recognized rule of common law, and that violation must damage the claimant. *Land,* 29 Fed. Cl. at 753 (citing Black's Law Dictionary 1446 (5th ed. 1979)); *Menominee Indian Tribe v. United States*, 39 Fed. Cl. 441, 458 (1997); *Estate of Braude v. United States*, 35 Fed. Cl. 99, 109 (1996).[6] This occurs not only when a plaintiff has a claim under a statute that is otherwise barred by sovereign immunity, but also, for example, when the government acquires benefits through the overreaching of its agents, when government officials act outside the scope of their authority, or when government actions have resulted in unjust enrichment.[7] To support an equitable claim based on a negligent action, fault of a different sort must be shown: the plaintiff must demonstrate that "the government possessed a duty . . . , that the government breached that duty, and that the breach caused the plaintiff's damage." *INSLAW, Inc. v. United States*, 40 Fed. Cl. 843, 858 (1998); *see also Menominee Indian Tribe*, 39 Fed. Cl. at 458; *Land*, 35 Fed. Cl. 345, 349 (1996). Outside the wrongful or negligence spheres are governmental actions that violate only principles of ethics or morality – such actions, even where they offend the conscience, give rise only to a gratuity. *See Banfi*, 40 Fed. Cl. at 122; *Benoit v. United States*, 2000 WL 1134472 at *2 (Fed. Cl. Jul. 28, 2000).

Silhouetted against this legal landscape, plaintiff readily acknowledges both that its claim for interest and litigation fees is not a legal claim and that, to qualify for an equitable claim, it must show that the interest and litigation fees sought were the result of wrongful or negligent

---

[6] *See also Cal. Canners*, 9 Cl. Ct. at 785 (finding no wrongful conduct when government officials, in a proper exercise of discretion, declared cyclamates as potential carcinogens), *Shane*, 3 Cl. Ct. at 305 (finding no compensable wrongful conduct when Air Force assessments of noise, which resulted in plaintiff's land being re-zoned as non-residential, may have been correct).

[7] *See Merch. Nat. Bank of Mobile v. United States*, 7 Cl. Ct. 1, 9 n. 6 (1984) (government official made promises of loan guarantees beyond what he was authorized to do); *Gay St. Corp. v. United States*, 127 F. Supp. 585, 590 (Ct. Cl. 1955) (government contracted to pay plaintiff to make certain alterations to a building government leased from plaintiff; government enjoyed benefit of the alterations without making payment); *see also Sneeden*, 33 Fed. Cl. at 309.

conduct by the government. In attempting to shoulder the latter burden, it argues that the VA's conduct in the initial proceedings before the Board was wrongful – a "travesty of justice," it echoes – because it was precluded from cross-examining the VA's witnesses or otherwise challenging the submissions received by the Board from the VA after the conclusion of plaintiff's case,[8] and because the same individual advised the contracting officer to reject the claims and then prepared the Board's decision upholding those decisions. In plaintiff's view, this wrongful conduct not only extraordinarily delayed the favorable resolution of its claims, but also required it to incur significant litigation costs to vindicate its claims.

In these regards, plaintiff contends, this case closely resembles another congressional reference, *Purvis v. United States*, in which this court found that the claimant had an equitable claim against the United States for interest and reasonable attorneys fees, owing to the 18-year delay in the resolution of certain contract claims relating to the construction of certain buildings at the 1962 Seattle World's Fair.[9] As plaintiff notes, Purvis' plight was prominently featured together with its own in the Congressional hearings that led to the passage of the interest provisions of the Contract Disputes Act. *See* S. Rep. No. 98-377, at 2 (1984) (reporting favorable on the resolution that referred *Purvis* to this court); 124 Cong. Rec. 31645 (1978). In *Purvis*, however, the hearing officer did not analyze whether the claimant had proven an equitable claim, but instead merely adopted a stipulation proposed by the parties – and the review panel, in turn, adopted the hearing officer's findings also at the parties' urging. Both of these decisions, moreover, predate the sea change in this court's jurisprudence that established that equitable claims must be based not upon amorphic equitable considerations, but a finding of fault. *Compare Burkardt v. United States*, 84 F. Supp. 553, 560 (Ct. Cl. 1949) (allowing interest) *with Banfi*, 40 Fed. Cl. at 121 (noting that the standard applied in *Burkardt* "no longer finds favor"); *Spalding*, 28 Fed. Cl. at 250 (same).

Notably, cases applying the modern rule have generally refused to recommend equitable claims for both pre- and post-judgment interest where that interest was not authorized by law at

---

[8] The court notes that plaintiff's assertion that it was not permitted to challenge the VA's submissions appears to misstate somewhat the procedure employed by the Board, under which plaintiff apparently was provided an opportunity to further support its contentions before a final report was forwarded to the Assistant Administrator for his decision. *See* 38 C.F.R. § 1.754 (1955); *see also J.D. Hedin Constr. Co. Inc. v. United States*, 408 F.2d 424, 427 (Ct. Cl. 1969) (discussing the 1956 version of this regulation). In the original *J.L. Simmons* case, the Court of Claims did not find to the contrary, *see J.L. Simmons*, 412 F.2d at 1366. In the undersigned's view, this does not significantly impact the analysis herein.

[9] Like the instant congressional reference, *Purvis* also followed a decision in which the Court of Claims found in the plaintiff's favor on various contract claims, but neither awarded interest nor attorney's fees. *See Purvis v. United States*, 216 Ct. Cl. 398 (1978). While unreported, the congressional reference reports in *Purvis* may be found at 133 Cong. Rec. 22931-32 (Aug. 6, 1987).

the time the delay in payment was encountered. Such was the case, for example, in *Estate of Braude*, 38 Fed. Cl. at 487, where this court rejected plaintiff's request for interest on a back pay award because the provision allowing for interest on such awards, 5 U.S.C. § 5596(b)(2), was not in effect during the years in question. There, the hearing officer reasoned that "[i]nterest is permitted in congressional reference cases only when a statute waives the government's sovereign immunity against interest on the particular category of damages found." 38 Fed. Cl. at 487; *see also Gay St. Corp.*, 130 Ct. Cl. at 350 (applying this rule). Likewise, in *Benoit*, the review panel refused to recommend interest on an equitable award, reasoning:

> Essentially, plaintiffs' request is a claim for loss of use of the $415,000 balance which has not yet been paid. However, there is no provision in the Military Claims Act for additional compensation for any delay in payment, such as an award of interest. *See* 10 U.S.C. § 2733. Therefore, any such additional compensation in favor of plaintiffs would be preferential treatment not available to all other claimants under the Military Claims Act. Such preferential treatment is disfavored in Congressional Reference matters. *See Mackie v. United States*, 172 Ct. Cl. 393, 398 (1965).

*Benoit v. United States*, 2001 WL 567737 at *5 (Fed. Cl. 2001); *see also Aurex Corp. v. United States*, 175 Ct. Cl. 1, 13 (1966) (noting that "even in this equitable proceeding there is inadequate ground for departing from the usual rule in this court against interest on non-tax and non-eminent domain awards against the Government"). Under these cases, then, it is of cardinal significance, in dealing with plaintiff's interest claims, that, as the Court of Claims found in *J.L. Simmons*, 412 F.2d at 1389, no provision of law effective at the time of plaintiff's original claims and subsequent lawsuit authorized the payment of interest of the sort it seeks here.[10]

Concededly, the foregoing decisions involved referred cases in which the plaintiff was seeking both an affirmative recovery of damages ***and*** some form of interest on those damages, while the case *sub judice* involves only a request for interest (and litigation expenses). But, that is a distinction without a difference – nothing in the rationales employed in these prior cases is the least bit sensitive to whether an interest claim is raised appurtenant to a substantive claim or

---

[10] From the time plaintiff filed its claims through the passage of the CDA, the common law rule that delay or default in the payment of money gave rise to interest was inapplicable to the government absent a waiver of sovereign immunity. *See United States v. North Carolina*, 136 U.S. 211, 216 (1890); *United States ex rel. Angarica v. Bayard*, 127 U.S. 251, 260 (1888); *Ramsey v. United States*, 101 F. Supp. 353, 356 (Ct. Cl. 1951); *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 95 Ct. Cl. 244 (1941). Indeed, in 1948, shortly before plaintiff undertook the VA contract, Congress enacted a forerunner of 28 U.S.C. § 2516(a), which essentially provided then, as it provides now, that "interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof." *See* Act of June 25, 1948, c. 646, 62 Stat. 978.

independently. On the other hand, the foregoing decisions arguably are distinguishable from the case *sub judice* in that they apparently did not involve claims that the government acted wrongfully in delaying payments of amounts found due and owing. Plaintiff argues (sans citations) that the wrongful conduct requirement is met here because of deficiencies identified in the procedures used by the Board to resolve plaintiff's five claims. But, this assertion is untenable for several reasons.

First and foremost, there is no indication that the procedures used by the Board somehow violated a rule of law so as to be "wrongful." To be sure, as plaintiff emphasizes, the Court of Claims, in *J.L. Simmons*, held that those procedures violated the disputes clause in the contract and, based on that holding, remanded the matter to the Board for further proceedings. But, the decisional law suggests that not every violation of a contract term constitutes "wrongful conduct." In dealing with a variety of issues, indeed, courts have held that breach of the provisions of a contract is not "wrongful" unless it can be shown that the action was taken without a good-faith belief that it was justified. For example, in *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003), the Federal Circuit concluded that a claim of coercion requires a contractor to show that the government's action was "wrongful." *Id.* at 1330. Proof of wrongfulness, in turn, requires that the action be shown to be "illegal, . . . a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or . . . a breach of the implied covenant of good faith and fair dealing." *Id.*; *see also Abatement Contracting Corp. v. United States*, 58 Fed. Cl. 594, 608 (2003) (applying the same definition). These opinions track numerous others holding that "wrongful conduct" does not arise upon the mere breach of a contract.[11] Far from being idiosyncratic, the *ratio dicendi* of these cases consistently rely on well-accepted notions of what is meant by the term "wrongful," thereby indicating that a similar rule ought to apply here. To rule otherwise would be to blur the distinction between gratuities and equitable claims, divorcing from the latter the indicium of fault that has become the core characteristic thereof. Quite literally, were the rule otherwise, plaintiff would not need to quibble with the nature of the Board's procedures, but instead could establish

---

[11] *See, e.g., Berkla v. Corel Corp.*, 302 F.3d 909, 917 (9th Cir. 2002) (breach of contract not "wrongful conduct" for purposes of imposing punitive damages); *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir. 1993) ("'Wrongful' conduct requires something more than mere breach of contract."); *Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir. 1990) (holding that a mere breach of contract did not constitute "wrongdoing" for purposes of imposing a constructive trust); *Mahoning Valley Sanitary District ex rel. Betty D. Montgomery*, 2001 WL 1871490 at *11 (S.D. Ohio Oct. 17, 2001) (mere breach of contract not wrongful); *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 2000 WL 217750 at * 3 (E.D. Pa. Feb. 16, 2000) (breach of contract not wrongful for purposes of claim of tortious interference with contract); *Cf. Spark v. Fidelity Nat. Title Ins. Co.*, 294 F.3d 259, 268 (1st Cir. 2002). Consistent with the view expressed in these cases, Justice Holmes once wrote that "[t]he duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it – and nothing else." Oliver Wendell Holmes, "The Path of the Law" in Collected Legal Papers 167, 175 (1920).

an equitable claim by unabashedly invoking ***any*** of the VA's judicially-rejected interpretations of the contract in question. The decisional law, however, indicates that more is required to demonstrate wrongfulness.

Here, there is no indication that, at the time it employed them, the Board knew that its procedures violated the contract or were illegal. To the contrary, while, for example, the *ex parte* nature of the 1956 proceedings before the Board undoubtedly seems out of step under today's standards, those procedures were consistent with the approach used by many agencies at the time.[12] Various courts rejected claims that these procedures violated the due process requirements of the Constitution or some other then-existing provision of law. In *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424 (Ct. Cl. 1969), for example, the Court of Claims reviewed a determination by the VA Board that sustained a default termination, surveying, at length, the procedures used by the Board in hearing the contractor's appeal. *Id*. at 427. Although it eventually overturned the default determination for other reasons, the court rejected the contractors' claim for a new trial on that issue based on defects in the Board's procedures, opining:

> In the milieu of the 1950's in which this Board hearing was conducted, it was not a clear violation of due process or the Wunderlich Act to base the administrative determination on this type of *ex parte*, layered, informal proceeding. Many such 'hearings' were held and we cannot say that, in that era, they were wholly invalid.

*Id*. The same VA procedures were also upheld, against a due process challenge, in *Malan Constr. Co. v. United States*, 318 F.2d 709 (2d Cir. 1963) (per curiam), *aff'g*, 217 F. Supp. 955, 956 (S.D.N.Y. 1962), and similar procedures employed by the Armed Service's Board of Contract Appeals were upheld – again by the Court of Claims – in *Sternberger v. United States*, 401 F.2d 1012, 1017-18 (Ct. Cl. 1968). Of course, language in these opinions certainly suggests that the Board's procedures were perceived as unfair, perhaps all the more so after *Wunderlich* further limited review of agency contract decisions, but that is not enough to establish an equitable claim

---

[12] This was noted in the early legislative history of the Wunderlich Act. Thus, for example, House Report 1380 described the state of affairs around the time plaintiff was originally pursuing its administrative claims thusly –

> It has been brought to light in public hearings that it is the exception rather than the rule that contractors in the presentation of their disputes are afforded an opportunity to become acquainted with the evidence in support of the Government's position.

H.R. Rep. 83-1380, at 5 (1954). In addition, at hearings conducted before the House Committee on the Judiciary, a representative from the firm that now represents plaintiff specifically testified that the procedures at the Bureau of Reclamation were, in critical respects, the same as those then being used by the VA. *Id*. at 78-79.

based on the law as it existed at the time the VA proceedings were initially conducted. *See Estate of Braude*, 35 Fed. Cl. at 109 (no equitable claim based on unfairness).

Second, *assuming arguendo* the Board's procedures constituted wrongful conduct sufficient to trigger the payment of some interest, the fact remains that plaintiff has not shown that conduct caused it to incur most of the interest requested. Plaintiff cites no wrongful conduct whatsoever that would support the payment of interest, for example, from the time the Board rendered its decision in 1956 to the time plaintiff filed its first petition in the Court of Claims in 1959, or from the time plaintiff received payment on its claim in 1969 to the time the Senate passed its resolution in 2001. Indeed, while plaintiff attributes the delay in the judicial resolution of its contract claims by the Court of Claims, between 1959 and 1969, to deficiencies in the original Board proceedings, the Court, in the original *J.L. Simmons* decision, instead attributed the lion's share of that delay to the fact that the case became "enmeshed" in the course of events that began with the *Wunderlich* decision in 1951, continued through the passage of the Wunderlich Act in 1964, and concluded with the Supreme Court's decisions in *Bianchi*, *Utah* and *Grace* in 1966. Accordingly, at best, only a few years of the delay experienced by plaintiff can even arguably be attributed to the government's "wrongful" conduct, leaving plaintiff in essentially the same position as numerous other contractors who, without the payment of interest, were subject to the agencies' subnormal administrative procedures in the days prior to the passage of the Wunderlich Act and the Contract Disputes Act. In the undersigned's view, this seals the conclusion that the interest plaintiff seeks is essentially a gratuity – a view that finds considerable support in other congressional reference cases.[13]

Likewise misplaced is plaintiff's assertion that its request for litigation expenses – primarily attorney's fees – is an equitable claim. Of course, the rule in the United States is that parties are ordinarily required to bear their own attorney's fees. This rule long predates the modern decision oft-cited for this proposition, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); it dates back perhaps as far as the Eighteenth Century, *see Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306 (1796), and certainly was well-established in the latter part of the

---

[13] *See Benoit,* 2001 WL 567737 at *5 (providing interest to only a few of many similarly-situated individuals is "disfavored"); *Mackie v. United States*, 172 Ct. Cl. 393, 398 (1965) (providing a plaintiff with compensation beyond that available to similarly-situated individuals would be to give "preferential treatment, which is abhorrent to our sense of justice."); *Aurex Corp.*, 175 Ct. Cl. at 8 (indicating that compensation should not be provided on the basis of detriments suffered during World War II because "it would be unjustified special treatment to single out one business for such relief unavailable to the multitude of others in the same class"); *see also Stone v. United States*, 160 Ct. Cl. 128, 132 (1960).

Nineteenth Century,[14] at any rate, long before the events in question.[15] To be sure, a well-known exception to this rule lies where "the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Alyeska*, 421 U.S. at 258-59 (quoting *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129 (1974)); *see also Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 756 (1980). While this exception focuses on the conduct of a party both before and in litigation, *see Hall v. Cole*, 412 U.S. 1, 15 (1973), plaintiff does not contend, let alone show, that this exception was triggered either by the conduct of the Board proceedings or the government's handling of the original *J.L. Simmons* case. Indeed, while plaintiff readily sought interest in its Court of Claims case, it conspicuously made no claim for attorney or consultant fees. Nor does plaintiff attempt to show that the attorney's fees and expenses in question would have been recoverable under some statutory- or rule-based exception to the American Rule that could be applied to the United States in this context, either directly or via an equitable extension of a fee provision that ordinarily applied only to private litigants. In short, as is the case with plaintiff's interest claims, there is no indication that the government committed a wrong that should lead to the recovery of these litigation expenses. *See Catalina Props., Inc. v. United States*, 305 F.2d 380, 386 (Ct. Cl. 1962) (refusing to recommend attorney's fees in similar circumstances).

Nor should the result on either the interest or litigation expense claims be different because the legislation referred by the Senate specifically envisions the payment of a sum necessary to "make J.L. Simmons Company, Inc., and any of its subcontractors, whole for any litigation expenses, and any interest, due and owing to J.L. Simmons Company, Inc." With all due respect, this bill language, of course, is just that – bill language – and not positive law that supports either a legal or equitable claim. As observed in like circumstances in *Paul v. United States*, 20 Cl. Ct. 236 (1990):

> The court's obligation in a congressional reference case is founded on statutory law. Language added or omitted in the reference resolution, or addition of supplementary language by one House of Congress at the time the reference resolution is under consideration, does not have the force and effect of an amendment to the basic law. It can neither add to nor subtract from the requirements of the reference statute.

---

[14] As to federal litigation, Congress essentially adopted this approach in the Act of Feb. 26, 1853, 10 Stat. 161. The rule also was plainly exhibited in numerous Supreme Court decisions during this period. *See, e.g., Stewart v. Sonneborn*, 98 U.S. 187 (1879); *Flanders v. Tweed*, 82 U.S. (15 Wall.) 450 (1873); *Oelrichs v. Spain*, 82 U.S. (15. Wall.) 211 (1872); *see also Alyeska*, 421 U.S. at 249-50 (tracing the genesis and history of the American Rule).

[15] A similar rule has long prevented the recovery of expert fees beyond those costs specifically authorized by statute. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987); *Henkel v. Chicago, St.P., M & O Ry. Co.*, 284 U.S. 444, 446-47 (1932).

*Id.* at 266 (footnote omitted); *see also Kanehl*, 38 Fed. Cl. at 96 (same); *Sneeden*, 33 Fed. Cl. at 308-09 (same). As such, though it clearly expresses a breadth of purpose to make plaintiff whole, the bill language does not fundamentally alter the nature of the inquiry here and, in particular, fails to convert what otherwise would be a gratuity into something more.[16]

## III. CONCLUSION

The undersigned is not insensitive to the fact that plaintiff did not receive interest that is now awarded as a matter of course under the Contracts Disputes Act. In the end, however, that fact proves inconsequential. Rather, for the foregoing reasons, the undersigned hearing officer finds that plaintiff, J.L. Simmons, does not have a legal or equitable claim against the government and that any award would be a gratuity.

s/ Francis M. Allegra
Francis M. Allegra
Hearing Officer

[16] While, by statute, this court is not authorized to determine the amount of a gratuity, *see Banfi Prods Corp. v. United States*, 41 Fed. Cl. 581, 583 (1998), it is worth noting that defendant disputes neither the methods by which plaintiff has calculated the interest and litigation expenses it claims nor the accuracy of the amounts derived under those methods.