**CONGRESSIONAL REFERENCE**
**To The**
**UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Congressional Reference No. 02-173X**

---

| | | |
|---|---|---|
| **J. L. SIMMONS COMPANY, INC.** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge Firestone** |
| **THE UNITED STATES** | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S EXCEPTIONS TO**
**<u>HEARING OFFICER'S REPORT</u>**

# Table of Contents

PLAINTIFF'S ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Standard of Review To Be Used . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Government's Conduct Was Wrongful By The Standard Relied Upon By The Hearing Officer . . . . . . . . . . . . . . . . . . . . . . . . 2

The Report Erroneously Concludes The Wrongful Conduct Did Not Cause the Delay Experienced By Plaintiff . . . . . . . . . . . . . . . . . . . . . . . 6

The Hearing Officer's Recommendation Against An Award Of Attorney's Fees And Other Litigation Expenses Is Clearly Erroneous . . . . . . 10

The Requirement That There Be Wrongful Conduct Of The Type And Nature Specified By The Hearing Officer Is Erroneous . . . . . . . . . . . . 12

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# Table of Authorities

**Statutes**

28 U.S.C. § 2509 .......... 12

41 U.S.C. § 321 .......... 3

**Supreme Court Cases**

*Glidden v. Zdanok*,
370 U.S. 530 (1962) .......... 13

*Schweiker v. McClure*,
456 U.S. 188 (1981) .......... 4

*Tumey v. Ohio*,
273 U.S. 510 (1927) .......... 4

*United States v. Carlo Bianchi & Co., Inc.*,
373 U.S. 709 (1963) .......... 6

*United States v. Anthony Grace & Sons, Inc.*,
384 U.S. 424 (1966) .......... 6

*United States v. Wunderlich*,
342 U.S. 98 (1951) .......... 4

*United States v. Utah Const. & Mining Co.*,
384 U.S. 394 (1966) .......... 6

*United States Gypsum Co. v. United States*,
333 U.S. 364 (1948) .......... 1

*Ward v. Village of Monroeville*,
409 U.S. 57 (1972) .......... 5

**U. S. Court of Appeals for the Federal Circuit Cases**

*Millmark Services, Inc. v. United States*,
731 F2d. 855 (1984) .......... 1

**Court of Federal Claims and Predecessor Courts Cases**

*Amick v. United States*,
5 Cl. Ct. 426 (1984) .......... 13

*Blabon v. United States*,
146 Ct. Cl. 13 (1959) .......... 12

*Burke v. United States*,
199 Ct. Cl. 897 (1972) .......... 9

*Burkhardt v. United States*,
113 Ct. Cl. 658 (1948) .......... 2,12,13,14,15

*Clarkson v. United States*,
194 Ct. Cl. 963 (1971) .......... 13

*Drake American Corp. v. United States*,
168 Ct. Cl. 318 (1964) .......... 12

*Estates of E. L. Armiger, et al. v. United States*,
168 Ct. Cl. 379 (1964) .......... 12

*Froman, et al. v. United States*,
157 Ct. Cl. 661 (1962) .......... 12

*Ghitiescu v. United States*,
201 Ct. Cl. 823 (1973) .......... 13

*J.D. Hedin Construction Co. v. United States*,
187 Ct. Cl. 45 (1969) .......... 5,6

*Kanehl v. United States*,
38 Fed. Cl. 89 (1997) .......... 10

*Land v. United States*,
29 Fed. Cl. 744 (1993) .......... 13,15,16

*Merchants National Bank of Mobile v. United States*,
7 Cl. Ct. 1, (1984) .......... 1

*Messina, et al. v. United States*,
193 Ct. Cl. 993 (1970) .......... 12,13

*O'Donnell, et al v. United States*,
166 Ct. Cl. 107 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Paul v. United States*,
20 Cl. Ct. 236 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Phillips v. United States*,
207 Ct. Cl. 924 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Purvis v. United States*,
Cong. Ref. No. 1-84 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11

*Rawlins v. United States*,
197 Ct. Cl. 972 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rumley v. United States*,
169 Ct. Cl. 100 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Spalding And Son, Inc. v. United States*,
24 Cl. Ct. 112 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Southwest Metro. Water and Sanitation Dist., Colo. V. United States*,
194 Ct. Cl. 994 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sternberger v. United States*,
185 Ct. Cl. 528 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Town of Kure Beach v. United States*,
168 Ct. Cl. 597 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wong v. United States*,
Cong. Ref. No. 3-74, decided May 16, 1979,
synopsis at 220 Ct. Cl. 750 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Other Federal Courts Cases**

*Malan Construction Co. v. United States*,
217 F. Supp. 955 (1962) *aff'd* 318 F.2d 709 (2d Cir. 1963) . . . . . . . . . . . . . . . . . 5,6

**State Court Cases**

*Easter House v. Dept. of Children and Family Services*,
561 NE2d 1266 (Ill.1990), *app. den.* 567 NE2d 331 (1991) . . . . . . . . . . . . . . . . . 4

**Treatises and Other Authority**

Restatement 2nd, Torts, §431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Restatement 2d, Torts, §435 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Questions Presented

In a congressional reference case, after the Hearing Officer has prepared the Report, either party may take exception to any of the findings or conclusions of law made therein. Plaintiff's exceptions raise the following issues:

(1) Has the Hearing Officer erroneously concluded that "wrongful government conduct," as that term is used in determining whether a private relief claimant has an equitable claim, requires either an act or omission of negligence, or a violation of a standard of conduct set forth in a statute, regulation or the common law;

(2) Whether the correct standard to be used in making such a determination is that set forth in the case of *Land v. United States*, 29 Fed. Cl. 744 (1993); and

(3) Whether plaintiff has an equitable claim as that term is used under either of the two standards.

## PLAINTIFF'S ARGUMENT

### The Standard of Review To Be Used

Plaintiff respectfully requests the review panel to set aside the findings and recommendation of the Hearing Officer in this congressional reference case as they are clearly erroneous as set forth below, RCFC, Appendix D, Par. 7. A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed, *Millmark Services, Inc. v. United States*, 731 F2d. 855, 857 (Fed. Cir. 1984) [quoting *United States Gypsum Co. v. United States*, 333 U.S. 364, 395 (1948)]. Conclusions of law by the Hearing Officer, however, are not protected by the clearly erroneous standard and are subject to *de novo* review,*Merchants National Bank of Mobile v. United States*, 7 Cl. Ct. 1, 8-9 (1984).

The Hearing Officer's Report includes both errors with respect to what is required to establish an equitable claim as that term is used in congressional reference cases, a conclusion of law, and with respect to the facts underlying the circumstances giving rise to plaintiff's initial claim against the Government approximately 50 years ago. It is respectfully submitted that review of the entire evidence leaves a definite conviction that a mistake has been made by the Hearing Officer as to many of his findings and the ultimate conclusion he draws from them.

The Hearing Officer correctly finds that plaintiff acknowledged that " . . . it must show that the [relief] sought were the result of wrongful or negligent conduct by the government.", Report, pages 8-9. Although plaintiff did make such an acknowledgment and reiterates that as the term wrongful conduct is used in the Report, it has been subjected to wrongful conduct; plaintiff now believes that it was in error when it made the acknowledgment, the Hearing Officer was in error in his conclusion concerning the degree or type of wrongful conduct that is required

and that the standard set forth in *Burkhardt v. United States*, 113 Ct. Cl. 658, 667 (1948) and numerous other cases is the correct standard to be applied, *i.e.*, that an equitable claim exists whenever the government in good conscience, based on non-juridical principles of equity should grant relief to a private relief claimant. This point will be discussed further, *infra*.

**The Government's Conduct Was Wrongful By The**
**<u>Standard Relied Upon By The Hearing Officer</u>**

At page eight of the Report, the Hearing Officer sets forth the standard that he found applicable for establishing the existence of an equitable claim in congressional reference cases, *i.e.*, that the government must have committed a wrongful or negligent act. In the first full paragraph on page eight the Report states: "What is wrongful or negligent action under this standard? As noted above, wrongful conduct carries with it an element of fault [citations omitted]. It thus entails more than a mere error or questionable exercise of government discretion, rather *there must be be some violation of a standard of conduct established by statute or regulation or a recognized rule of common law*, and that violation must damage the claimant [citations omitted]." [emphasis supplied]. At pages 11-12 of the Report the Hearing Officer erroneously mischaracterizes the conduct of the Veterans Administration as being a mere breach of contract. This finding is clearly erroneous as it is contrary to the undisputed evidence presented that the Board's *ex parte* procedures were in violation of the Wunderlich Act, 41 U.S.C. § 321, *et seq*. And that the Veterans Administration knew, or should have known, that its nomination of Mr. Harding to its Construction Contract Appeals Board (hereinafter "Board"), when he had participated in the denial of plaintiff's claim at the Contracting Officer level, was

wrongful and not to be done pursuant to an internal memorandum written approximately 10 years prior to the Board's initial hearings in plaintiff's case.

These facts, although not included in plaintiff's Motion for a Favorable Hearing Officer's Report (hereinafter "Plaintiff's Motion"), or its reply to the Government's response to the motion were discussed at length during oral argument before the Hearing Officer, (Ex. 1, pages 12-19, 30-32). The Hearing Officer requested that plaintiff supplement its motion to include these facts and further advised the Government that it would have the opportunity to respond, (Ex. 1, page 19, lines 13-24). Plaintiff filed its supplement on October 30, 2003, but the Government elected to file no additional response to plaintiff's motion.

Accordingly, the following facts are uncontroverted, but entirely ignored in the Report. The legislative history of the Wunderlich Act, 41 U.S.C. § 321, *et seq.*, clearly establishes that Congress was aware that the Veterans Administration and the Interior Department utilized *ex parte* procedures at the time that it was considering the passage of the Wunderlich Act in 1954, (Ex. 1, pages 14-18; Motion for Leave to File Supplement to Plaintiff's Motion for a Favorable Hearing Officer's Report (hereinafter "Supplement"), Attachment 1, pages 4-5 and 78). The legislative history is also clear that Congress included language in the Wunderlich Act specifically for the purpose of preventing agency boards of contract appeals from using *ex parte* procedures (Ex. 1, pages 15-17; Supplement, Attachment 1, pages 4-5). The Board's continued use of *ex parte* procedures after the passage of the Wunderlich Act in 1954, as was the case with respect to its initial hearing of plaintiff's case, violated a standard of conduct established by

statute and should therefore be found wrongful pursuant to the reasoning set forth in the Report. A finding to the contrary is clearly erroneous.

With respect to the dual role played by Mr. Harding (Complaint, Par. 19; Answer, Par. 19), it is also uncontroverted that the Veterans Administration had, prior to its initial consideration of plaintiff's claims in 1955, determined that it was improper to engage in such conduct (Ex. 1, pages 30-32; Supplement, Attachment 3, page 225)

The inclusion of an interested party on an administrative tribunal is a clear denial of due process, *Schweiker v. McClure*, 456 U.S. 188, 195 (1981); *Easter House v. Dept. of Children and Family Services*, 561 NE2d 1266 (1990), *app. den.* 567 NE2d 331 (1991). In the case of *Tumey v. Ohio*, 273 U.S. 510 (1927), the Supreme Court stated at page 532, that the test of whether the arbiter's interest is sufficient to deny due process is one ". . . which would offer a possible temptation to the average man as a judge to forget the burden of proof required . . . or which might lead him not to hold the balance nice, clear and true between [the parties]."

In plaintiff's case, the average person, having participated in the Contracting Officer's decision denying the claim, would certainly be tempted to side with the Government in order to avoid the embarrassment of acknowledging that he and his colleague/superior (the Contracting Officer) were wrong in denying the claim at the Contracting Officer level. As Mr. Justice Jackson noted in his dissent in *United States v. Wunderlich*, 342 U.S. 98, 103 (1951), "Men are more often bribed by their loyalties and ambitions than by money." It is clear that Mr. Harding's participation on the panel was a wrongful denial of due process to plaintiff. The fact that plaintiff ultimately was able to attain a due process hearing does not render Mr. Harding's

involvement in the first hearing any less wrongful. See *Ward v. Village of Monroeville*, 409 U.S. 57, 61 (1972).

Although the Hearing Officer's description at page eight of what is meant by wrongful, *i.e.*, a violation of a standard of conduct established by statute or regulation, etc., does not expressly include standards of conduct established by the constitution or case law interpreting the same, it is respectfully submitted that no good reason exists not to include the same in what is meant by wrongful in determining whether an equitable claim exists for congressional reference case purposes, and that therefore, as Mr. Harding's inclusion on the Board runs afoul of the Constitution and the case law cited above, his participation provides a further basis for finding that the original hearing before the Board was wrongful government conduct, particularly since the Veterans Administration had previously determined that such participation was improper.

The report further states that the constitutionality of the Board's procedures had been reviewed and upheld previously, citing *J.D. Hedin Construction Co. v. United States*, 187 Ct. Cl. 45, 50-52 (1969); *Malan Construction Co. v. United States*, 217 F. Supp. 955 (1962) *aff'd* 318 F.2d 709 (2d Cir. 1963); and *Sternberger v. United States*, 185 Ct. Cl. 528, 536-537(1968). However, none of these cases involved the situation in plaintiff's case where an interested party (Mr. Harding) chaired the tribunal. The *Sternberger* case does not even involve a complaint about *ex parte* procedures, but instead involves a complaint that someone other than the hearing member wrote the board's opinion. Plaintiff's case appears to be uniquely egregious in this regard and thus it cannot be said that the constitutionality of Mr. Harding's participation on the panel has been upheld as the Report suggests.

The strength of *Hedin* and *Malan* as authority on the issue of whether a lack of opportunity for cross-examination constitutes a denial of due process is also suspect as neither case involves any real analysis of the issue. No case law either for or against is included in the discussion therein.

**The Report Erroneously Concludes The Wrongful Conduct**
**Did Not Cause the Delay Experienced By Plaintiff**

The Report concludes that the Board's wrongful conduct did not cause the delay experienced by plaintiff, which the Report breaks down into three distinct periods, (1) 1956-1959, described as being a period of time between the issuance of the Board's initial decision and the filing of plaintiff's first petition in this court's predecessor; (2) 1959-1969, the time when the case was enmeshed in the review of the Wunderlich Act by the Supreme Court in the *United States v. Carlo Bianchi & Co., Inc.*, 373 U.S. 709 (1963); *United States v. Utah Const. & Mining Co.*, 384 U.S. 394 (1966); and *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424 (1966) decisions; and (3) 1969-2001, described as the period from " . . . the time plaintiff received payment on its claim in 1969 to the time the Senate passed its resolution in 2001. This part of the Report includes not only erroneous statements of fact, but also a misconception or misunderstanding of the remaining facts and their basis for plaintiff's calculation of its damages such as to render it completely erroneous.

With respect to the initial period, 1956-1959, the Report implies that plaintiff is responsible for this delay of three years because it did not promptly file its petition for review in the Court. The Report is clearly erroneous as there was no delay by plaintiff between the Board's

issuance of its decision in February 1959, the Veterans Administration adoption of the decision on March 31, 1959 and the filing of plaintiff's petition in April 1959 (Complaint, Pars. 20 and 21; Answer, Pars. 20 and 21). The Report, at page 13, misstates that the Board's decision was issued in 1956. This finding is clearly erroneous and should be set aside along with the conclusion implicitly drawn from it that plaintiff is responsible for this period of delay. Obviously this period of delay is directly attributable to the Board's wrongful conduct because some, if not most, of the time in this period involved the preparation, in response to plaintiff's case, of the *ex parte* evidence and the Board's consideration of it. In any event none of the time in this period should be viewed as being attributable to any delay or fault on the part of plaintiff. To the extent that the Report does so, it is clearly erroneous.

The second period, 1959-1969 also includes an error of fact. The period should be expanded to also include 1970, which is when the litigation was finally concluded and plaintiff received final payment (Complaint, Pars. 27-32; Answer, Pars. 27-32). More importantly though, the Hearing Officer does not recognize this period as having been caused by wrongful government conduct, but instead contends it was caused by the case's enmeshment in the review of the Wunderlich Act. Plaintiff believes the two are one and the same. The Report ignores the fact that but for the wrongful government conduct, plaintiff's appeal would have been unnecessary. No appeal would have been taken because when plaintiff finally received a due process hearing before the Board in 1996 no further appeal was necessary and none was taken (Complaint, Pars. 25-27; Answer, Pars. 25-27). In the absence of an appeal from the initial Board proceeding, plaintiff would not have been enmeshed in the fallout of the Supreme Court Wunderlich Act review cases (Ex. 2).

Although a substantial legal basis exists for finding that the delay from 1959-1970 was caused, in a legal sense, by the Board's wrongful conduct, the Report erroneously fails to follow this legal definition of causation or provide any basis or rationale why the legal definition of causation should not be used in this case. The Report simply declares that it was not caused by the Board's wrongful conduct and leaves it at that.

Under the common law, specifically in this regard, §431 of Restatement 2nd, Torts, entitled "What Constitutes Legal Cause," causation is defined in pertinent part as "The actor's . . . . . conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm. . . ." Applying this definition to the facts in this case it cannot be said that the Board's wrongful conduct was not a substantial factor in bringing about the delay plaintiff experienced since plaintiff would have experienced no delay but for the necessity of the appeal which exposed it to the Wunderlich Act review enmeshment.

Nor does it matter that the length of the delay plaintiff experienced was not foreseen or foreseeable. In this regard, Restatement 2d, Torts, §435 states in pertinent part:

> (1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

In this case the harm, delay, was actually foreseeable. The only thing that perhaps was not foreseeable at the time was the extent of the delay that would ensue as a result of the Board's wrongful denial of plaintiff's claim in 1959.

Accordingly, because there is a well established basis in the common law for finding that the delay plaintiff experienced from 1959-1970 was in fact caused by the Veterans

Administration's wrongful conduct, any finding to the contrary is clearly erroneous and should be set aside.

The final period represents the additional delay plaintiff experienced in obtaining the reference. The premise for this part of the damages claimed is both the language of the reference itself, which directs the Court to determine the amount required to make plaintiff whole and the decision in *Burke v. United States*, 199 Ct. Cl. 897, 915 (1972). In *Burke,* the Court adjusted the amount it determined was due to reflect the reduction in present day value the award would represent due to the passage of time. This is precisely the same method plaintiff's calculation adopts and in fact plaintiff has used the same Bureau of Labor Statistics index the Court used to calculate the amount sought for the final period, *(Burke*, *supra*, at page 915; Plaintiff's Motion, Par. 39; Plaintiff's Motion, Exhibit B, Par. 10, Plaintiff's Motion, Schedule B and Attachment 3 thereto).

The Hearing Officer also recommends against compensating plaintiff for the delay experienced under the theory that plaintiff is seeking preferential treatment. This concern is not clearly stated in the Report but is expressed in the following statement at page 13:

> " . . . leaving plaintiff in essentially the same position as numerous other contractors . . . "

and again at page 13 in the parenthetical comments found in footnote 13. There simply is no evidence in the record to suggest that this is a valid concern, and, therefore, it should be set aside as clearly erroneous. The only evidence in the record concerning similarly situated individuals is that related to the plaintiff in *James P. Purvis v. United States*, Cong. Ref. No. 1-84, . The evidence undercuts the Hearing Officer's concern that plaintiff would receive preferential

treatment as Mr. Purvis was compensated for the extraordinary delays his company experienced with an award of both interest and litigation expenses. In fact this evidence undercuts the Hearing Officer's concern in two ways. First, the award of the damages of sought by plaintiff would not be preferential treatment because another entity previously received the same treatment. Secondly, an award to plaintiff cannot be viewed as preferential treatment because there is no evidence that there are any other, much less many other entities, similarly situated to Mr. Purvis and plaintiff.

Nor should plaintiff be faulted for the long time required to obtain the reference. Plaintiff has worked continuously throughout the intervening years to obtain the reference, (Plaintiff's Motion, Ex. B, Pars. 8 and 9). The Court itself has noted the length of time frequently required to obtain private relief bills and has further noted that private relief claimants should not be faulted for the delays inherent in the process, *Kanehl v. United States,* 38 Fed. Cl. 89, 95 1997); *Spalding And Son, Inc. v. United States*, 24 Cl. Ct. 112, 152 (1991); *Wong v. United States*, Cong. Ref. No. 3-74, decided May 16, 1979, slip opinion at page 27, footnote 15, synopsis at 220 Ct. Cl. 750 (1979).

**The Hearing Officer's Recommendation Against An Award Of**
**<u>Attorney's Fees And Other Litigation Expenses Is Clearly Erroneous</u>**

The Report recommends against any award of attorneys fees and other litigation expenses on the ground that they do not constitute an equitable claim. Although the Hearing Officer eventually gets to the relevant inquiry, whether wrongful conduct occurred, the crux of the objection to this part of plaintiff's private relief claim appears to be based on the fact that the law

of the United States is that parties are generally required to bear their own litigation expenses. Plaintiff does not deny that this is generally true, but asserts that as it is seeking equitable relief, the fact that it might not have a legal right to recover attorney fees and other litigation expenses is of little moment. Whether or not litigation expenses constitute an equitable claim should turn only on whether or not they were caused by wrongful conduct on the part of the Government under the standard utilized in the Report. Plaintiff respectfully submits that they do for the precisely the same reasons set forth, *supra*, with respect to the other elements (interest part) of plaintiff's request for relief. That is, but for the appeal necessitated by the Government's wrongful conduct, plaintiff would not have had to incur its litigation expenses.

In regard to the Report's comments on the effect that the language of the reference has on the Court's inquiry, the plaintiff does not disagree with the contention that the reference does not have the force of positive law. However, to the extent the Report might be interpreted as standing for the proposition that the language of the reference should be disregarded, plaintiff respectfully disagrees. The language of the reference provides direction to the Court, giving its inquiry focus. In this particular reference Congress has asked the Court to determine what is necessary to make plaintiff whole. Accordingly, the Court should consider whether an award of litigation expenses is necessary to make plaintiff whole in the circumstances and not disregard the language of the reference as the Report recommends because it is not positive law. Plaintiff further notes that the Court has recommended previously that attorney fees be awarded as an equitable claim in similar circumstances, *Purvis, supra.*

**The Requirement That There Be Wrongful Conduct Of The Type And Nature Specified By The Hearing Officer Is Erroneous**

Although as stated herein, *supra*, plaintiff has experienced wrongful conduct as defined in the Report, plaintiff respectfully contends it is erroneous to require the same to establish the existence of an equitable claim. At page nine, the Report states that a "sea change" in the Court's jurisprudence has occurred in recent years, which change requires that equitable claims must not be based upon amorphic equitable considerations.

Assuming *arguendo* the Hearing Officer is correct in finding there has been a "sea change"it begs the question, why should such a "sea change" occur? The equitable claim standard prior to the asserted "sea change" was as described in *Burkhardt v. United States*, 113 Ct. Cl. 658, 667 (1948), which interpreted the term equity broadly rather than in the strict sense in which the term is used in equity jurisprudence. Specifically, the Court in *Burkhardt* stated: "We are therefore of the opinion that the term "equitable claim" as used in 28 U.S.C., Sec. 2509, is not used in a strict technical sense meaning a claim involving consideration of principles or right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations." The *Burkhardt* definition of what constitutes an equitable claim has been used many times in private relief cases spanning several decades, *e.g.*, see *Blabon v. United States,* 146 Ct. Cl. 13, 21-22 (1959); *Froman, et al v. United States*, 157 Ct. Cl. 661, 669 (1962); *O'Donnell, et al v. United States*, 166 Ct. Cl. 107, 117-118 (1964); *Drake American Corp. v. United States*, 168 Ct. Cl. 318, 326 (1964); *Estates of E. L. Armiger, et al. v. United States*, 168 Ct. Cl. 379, 384 (1964); *Town of Kure Beach v. United States*, 168 Ct. Cl. 597, 622-623, 626 (1964); *Rumley v. United States*, 169 Ct. Cl. 100, 105-107 (1965); *Messina, et al. v.*

*United States*, 193 Ct. Cl. 993, 996-998 (1970); *Clarkson v. United States*, 194 Ct. Cl. 963, 972 (1971); *Southwest Metro. Water and Sanitation Dist., Colo. V. United States*, 194 Ct. Cl. 994, 997 (1971); *Rawlins v. United States*, 197 Ct. Cl. 972, 986 (1972); *Ghitiescu v. United States*, 201 Ct. Cl. 823, 827-828 (1973); *Phillips v. United States*, 207 Ct. Cl. 924, 929 (1975); *Amick v. United States*, 5 Cl. Ct. 426, 430 (1984). The *Burkhardt* standard has continued to be used in more recent cases, notwithstanding the "sea change," *e.g.*, *Land v. United States*, 29 Fed. Cl. 744, 753 (1993) [This court finds it conceivable that there is an area of non-intentional, non-negligent, "wrongful" action, for which the government may be held liable in equity in a congressional reference]; *Paul v. United States*, 20 Cl. Ct. 236, 267-269, 272 (1990). Plaintiff asserts that the *Land* standard is essentially the same standard utilized by the Court in *Burkhardt* and the other cases cited above in which the Court found that an equitable claim existed. While it is true that the Court may not have mentioned the wrongful conduct requirement in all of these cases, plaintiff respectfully submits that in each of them the Government in fact did commit a wrongful act, just that the act may not have risen to the level of negligence as some of the more recent reference cases state is required or the standard, violation of a code of conduct established by statute or common law espoused by the Hearing Officer in the Report. Plaintiff is unaware of any case which has held that in order to be wrongful the act must be intentional.

It is respectfully submitted that the *Burkhardt* standard is the more appropriate standard to be used because it is in keeping with the legislative intent regarding congressional private relief. During consideration of the 1966 amendments to the private relief statutes required in the wake of the Supreme Courts ruling in *Glidden v. Zdanok*, 370 U.S. 530 (1962), the intent of Congress to consider granting equitable relief in accordance with the meaning of that term given in the

*Burkhardt* case is clearly set forth in the legislative history. Specifically in this regard in a report entitled, "Congressional References Cases, U.S. court of Claims," dated September 22, 1966, the Senate Committee on the Judiciary reported in pertinent part as follows:

> It should also be remembered that in the special area with which private relief legislation deals, factors that in other areas ameliorate the possible harsh effects of general laws may not exist. Government officials are understandably unwilling to spend the taxpayers' money in situations in which they are not clearly authorized by statute to do so, whereas in a comparable situation a private party might well decide that, although under the law his obligation is not clear, he will pay another person what he feels that equity and fair play dictate he pay. Conversely, a Government official-despite his personal view of the equities of a particular situation-will be extremely reluctant to fail to press the Government's rights under a general statute, while a private party might decide that in good conscience he should forgo what is legally his due.
>
> (Ex. 3, page 4)

Congress' intent in this regard can also be revealed by the rules of the two subcommittees, one in the House and the other in the Senate charged with responsibility for considering private relief claims. The Senate's Subcommittee on Adminstrative Oversight and the Courts in the preamble to its rules states:

> The right to petition for redress of grievances is guaranteed by the first amendment to the Constitution. When called upon to decide whether relief should be granted persons seeking redress of grievances, the subcommittee is guided by principles of equity and justice. In connection with its jurisdiction over claims, the subcommittee considers private bills extending relief to individuals who have no other existing remedy. The task of the subcommittee is to determine whether the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an individual.
>
> (Ex. 4)

Similarly the House's subcommittee's preamble to its rules state in pertinent part[1]:

> In connection with its jurisdiction over claims, the subcommittee considers private bills extending relief to individuals who have no other existing remedy. The right to petition for a redress of grievances is guaranteed by the first amendment to the Constitution. When called upon to decide whether relief should be granted to persons seeking redress of grievances, the subcommittee is guided by principles of equity and justice. The task of the subcommittee is to determine whether the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an individual.
>
> (Ex. 5)

There is nothing in the legislative history or the rules of Congress indicating that the standard to be used is something other than that set forth in *Burkhardt* and *Land*. There is nothing to indicate that to have an equitable claim the claimant must establish that a standard of code established by statute, regulation or the common law has been violated. In fact it is respectfully submitted that if that was the case, the claimant would without exception always have a legal claim under the standard proposed in the Report. To adopt the Hearing Officer's restrictive interpretation of what is required for an equitable claim would limit equitable claims to only those instances where a statue of limitation had expired or the Government was negligent, but otherwise immune from suit because it had not waived its sovereign immunity. There is nothing in the legislative history, or the rules of Congress to support such a restrictive view of what is intended to be a special area reserved for equitable relief for entities with unusual claims involving extenuating circumstances.

---

[1]The complete rules of the House subcommittee are available online at the following URL: http://www.house.gov/judiciary/priclaimspro.pdf. Plaintiff is not aware of any corresponding online availability of the rules of the Senate's subcommittee.

**Conclusion**

The Report erroneously concludes that in order for a private relief claimant to have an equitable claim, the government must have committed a wrongful act equivalent to negligence or a violation of a statute, regulation or common law. The correct standard to be utilized is a less restrictive one as set forth in the *Land* case, *i.e.*, that an equitable claim can be based upon a wrongful act that is neither non-intentional or non-negligent. However, regardless of whether the standard adopted for use in this case is the one set forth in the Report or the less restrictive *Land* standard, the Veterans Administration's Construction Contract Appeals Board's procedures in its initial consideration of plaintiff's appeal constituted wrongful conduct as that term is used in congressional reference cases in determining whether the claimant has an equitable claim. The Review Panel should set aside the factual findings and legal conclusions in the Hearing Officer's Report that are contrary and report to the Senate that plaintiff has an equitable claim against the United States in the amount of $4,352.572.50.

Respectfully submitted,

Date: September 27, 2004

s/Christopher M. McNulty

Christopher M. McNulty

King & King, Chartered
Suite 400
7531 Leesburg Pike
Falls Church, Virginia 22043
Tel: (703) 564-0164

Attorney for Plaintiff, J.L. Simmons

**CONGRESSIONAL REFERENCE**
**To The**
**UNITED STATES COURT OF FEDERAL CLAIMS**

**Congressional Reference No. 02-173X**

| | | |
|---|---|---|
| **J. L. SIMMONS COMPANY, INC.** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge Firestone** |
| **THE UNITED STATES** | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S EXHIBIT 1**

Excerpts from transcript of proceeding before Judge Allegra, October 23, 2003

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| J.L. SIMMONS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 02-173X |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Courtroom 6, Room 507
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Thursday,
October 23, 2003

The parties met, pursuant to notice of the Court, at 10:07 a.m.

BEFORE: HONORABLE FRANCIS M. ALLEGRA
Judge

APPEARANCES:

For the Plaintiff:

Christopher McNulty, Esquire
King & King
7531 Leesburg Pike, Suite 400
Falls Church, VA 22043
(703) 564-0164

For the Defendant:

Brian S. Smith, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0391

Unfortunately that hasn't come to pass. As you know from the discussion that we've had previously, we have tried repeatedly to get a bill through Congress and we were finally successful.

Anyway, so we looked at this and I didn't really appreciate, initially, the government's argument about this. To me it just seemed obvious that the conduct was wrongful, so I didn't really begin to appreciate what the government was saying until I got their response to our motion for the favorable hearing officer's report.

And as I understand it, it seems to me that they're saying, oh well, the conduct's not really wrongful because you have to look at it back in the 1950s and this is just the way things were done, and everybody was doing it, and so therefore it's not wrongful. I don't think that's a very good argument.

THE COURT: Well, let me -- before you go too far with that, I just want to make sure, and I know we've had these discussions before, so forgive me if we're covering ground a second time. It does appear that there is a distinction between wrongful and just simply erroneous, correct?

All right, so if we didn't have some of the allegations here, or maybe more than allegations here

in terms of what happened with the agency review process, but that the agency had simply improperly denied the claims at that time, that wouldn't be wrongful, would you agree?

MR. McNULTY: If they improperly -- I mean, if there was just a --

THE COURT: In other words, the process and procedures were perfectly fine but there was some disagreement about what the contract called for, there was some disagreement about what expenses occurred.

MR. McNULTY: I would agree.

THE COURT: In other words, you don't necessarily equate the word "wrongful" with simply erroneous?

MR. McNULTY: No.

THE COURT: Okay.

MR. McNULTY: No, it's our position, the Plaintiff's position, that the procedures were wrongful, regardless of whether you viewed them in terms of today or yesterday, and I'm going to get into that a little more specifically in just a minute. I think that even in the perspective of yesterday they were wrongful and that's why they've been changed. That's why the court overturned the VA's initial decision.

But I'm going to get into that with some specificity, Your Honor.

THE COURT: Go ahead.

MR. McNULTY: Because as I began to appreciate what the government was saying and I discussed it with my cocounsel, Paul McNulty, my father, who tried the case during the sixties, he said I should take a look at the legislative history of the Wunderlich Act because it was his recollection that there was a great deal of discussion about this sort of thing.

And so I did, and in getting ready for this oral argument today, and I found it to be quite enlightening, and I think when you look at it you'll agree that it's clear that the conduct was wrongful, and even then people viewed it as being wrongful.

When I looked into it, I discovered that the law before the Wunderlich case, which is 342 U.S. 98, which was decided in 1951, was that administrative decisions were reviewed when they were shown to be arbitrary, capricious or so grossly erroneous as to imply bad faith, notwithstanding the fact that the parties had contracted that all matters of disputed fact might be decided by one of the parties to the contract, the government.

Now, in sort of summing that up, there's a really nice decision from the Court of Claims, Palace Corporation v. United States, which is 124 Ct. Cl. 545. And at page 549 of that decision, the court said, "Until the time of the decision in that case," referring to the Wunderlich case, "this Court had reviewed the contracting officer's decision when it was shown to be arbitrary, capricious or so grossly erroneous as to imply bad faith," the standard I just stated, "notwithstanding that the parties had contracted that all matters of disputed fact would be decided by one of the parties to the contract. Such a provision, we had understood, called for the highest good faith on the part of the interested party making that decision."

That was the law and it had been that way for a long time prior to the Wunderlich case. And in 1951 the Supreme Court sort of upset the applecart with the Wunderlich case, a case which, by the way, coincidentally, my firm handled. We won it in the Court of Claims and lost it in the Supreme Court. And there was a great hue and cry, and in response the Congress passed the Wunderlich Act in 1954, which was two years before this initial VA proceeding in this case. And the Wunderlich Act restored the former law

and the standard of review regarding arbitrary, capricious or grossly erroneous so as to imply bad faith. But it specifically added the requirement that the administrative decision be supported by substantial evidence.

And you say well, now why did they do that? Here you had this long history of the law in the United States prior to Wunderlich and then the Wunderlich Act is supposed to restore the law, but they've added something. And why was this added?

Well, if you look at the legislative history you'll discover why. And in the House Report Number 1380, which is part of the legislative history, it's 83rd Congress, second session. This report is dated March 22, 1954, and it's entitled Finality Clauses in Government Contracts, and at pages four to five of that report, the House Committee stated as follows:

"The inclusion of the standard `not support by substantial evidence' should also correct another condition arising out of the lack of uniformity between the various departments and agencies concerned in the appellate hearing procedures under the disputes clause. It has been brought to light in public hearings that it is the exception rather than the rule that contractors in the presentation of their disputes

are afforded an opportunity to become acquainted with the evidence in support of the government's position.

"It is believed that if the standard of substantial evidence is adopted," -- as it was -- "this condition will be corrected, and that the records of hearing officers will hereafter contain all of the testimony and evidence upon which they have relied in making their decisions. It would not be possible to justify the retention of the finality clauses in government contracts unless the hearing procedures were conducted in such a way as to require each party to present openly its side of the controversy and afford an opportunity of rebuttal."

Now, when we look at the rest of the legislative history, which conveniently, my firm prepared this book back in the '50s -- we were very active in the passage of the Wunderlich Act and I've reviewed all of that, and I've gone through it, and the only testimony that I can find that appeared in Congress to which they appeared to be eluding when they say it's come to light, is testimony that was presented by Mr. Gaskens of my firm at the time, who appeared.

And when you review his testimony, which appears at the beginning of page 77 of this same

hearing report, you will see that he is referring specifically to the Veteran's Administration and its ex parte procedures. And he also refers to the Interior Board, which is the board that the Wunderlich case came out of. And he specifically cites those two boards. They both have these -- had, in that day, these ex parte procedures. And there's no other reference in any of the testimony of dozens of witnesses that I could find in the legislative history that refer to this.

Now, I think it's a bit hyperbolic, that statement, that they say it's the exception rather than the rule, because elsewhere in the testimony there is -- I mean, I'm sorry, in the legislative history -- and I'm specifically referring now to Senate Report Number 1670, which is dated April 4, 1952.

In that report there's three witnesses who appear beginning at page 93, and they are represented as from the ASBCA, the Engineer Corps Board, and the -- the Corps of Engineers Board, and the General Services Administration. And they described in their testimony before Congress their procedures that existed at that time, which was 1952. And their procedures, as I reviewed them, appeared to be

remarkably similar to the procedures that are essentially in force today before all of the boards.

THE COURT: Is there some reason why this wasn't in your reply brief?

MR. McNULTY: I wasn't aware of it at the time, Your Honor. Until I was discussing with him in preparing for this oral argument the government's argument that oh, it was okay because everybody was doing it back then. And he said hey, you ought to take a look at the Wunderlich Act.

THE COURT: Did you give Mr. Smith indication that you were going to rely on these authorities prior to today?

MR. McNULTY: No. No, Your Honor.

THE COURT: Before you go too much farther, what I'm going to want you to do is to file a supplemental memorandum --

MR. McNULTY: All right.

THE COURT: -- that summarizes your views on this, to which I'm going to give Mr. Smith an opportunity to respond.

MR. McNULTY: Yes, sir.

THE COURT: So that if he wants to beyond today, he can go back and take a look at the same legislative history and see if there's anything there

example, to post-Wunderlich Act procedure but perhaps the pre- ones.

It wouldn't be a ridiculous situation these days, and this case, in fact, is an indication of that, but unfortunately some cases took a very long time to gestate at that point, so maybe it's possible that the agency there was rendering rulings that were reviewed in Bianchi that predated the effective date of the Wunderlich Act. So I'll go take a look at that.

MR. McNULTY: All right.

THE COURT: All right, so what we've been talking about gets us to the first component, in other words, is there a wrongful action that supports interest?

MR. McNULTY: Right, and I have just one more thing I'd like to add on that.

THE COURT: Sure.

MR. McNULTY: The ex parte nature of the proceedings aren't the only wrongful act that we pled. We also pled this dual role that one member of the panel played.

THE COURT: Sure.

MR. McNULTY: And that, I also found there.

THE COURT: You don't think that that's

being referred to in these references that I pulled from the opinion?

MR. McNULTY: It may very well be, but there's some further evidence that I discovered, again, after we filed the reply brief, in a May 1961 article that appeared in the *Journal of the Bar Association of the District of Columbia*, and it was written by a man named John Krogan who I'm informed was an attorney at the VA at the time. And in this article he discusses the history of the VA Board and how they've had to change their procedures.

But at page 224 and 225 of that article, he says something that very specifically relates to the wrongful nature of this dual role. He says that, "In the nomination" -- beginning at the bottom of page 224, he states, "In the nomination of the initial membership of the appeals committee, moreover, a paradoxical situation was caused by the unwitting designation of a contracting officer as chairman of the unit. However, it hastily being sensed that this forensic faux pas might cast the chairman in the role of being not without bias, the error was rectified by a subsequent memorandum."

And then there's a footnote, footnote number

5, and if you look down at the footnote, you'll see that that memorandum is dated in 1946. So in 1946 the VA Board was aware that they shouldn't have people sitting and hearing the appeal who were involved in the original decision. They knew that was wrong in 1946, but ten years later, in 1956, they did it in the Simmons case.

THE COURT: But if we look at the Simmons opinion again, I see references to the ex parte portion of it. In other words, it appears that that court was not just focusing on the way the evidence was presented, but also on the fact that there was this dual role being played here. At least I see some glancing reference to it, recognizing --

MR. McNULTY: Well, all I could say in response to that, Your Honor, is that if the VA Board itself knew it was wrong, then why shouldn't the court also have found it to be wrong? They themselves knew, according to this article, in 1946 they shouldn't be doing that, and when they did it they corrected it.

Now, the article is silent as to why it happened again in 1955 and '56, but the point I'm trying to make is they knew it was wrong and they did it, and so regardless of what the Supreme Court majority or the Court of Claims says about, well, you

**CONGRESSIONAL REFERENCE**
**To The**
**UNITED STATES COURT OF FEDERAL CLAIMS**

**Congressional Reference No. 02-173X**

| | | |
|---|---|---|
| **J. L. SIMMONS COMPANY, INC.** **Plaintiff,** | ) | |
| **v.** | ) | **Judge Firestone** |
| **THE UNITED STATES** **Defendant** | ) | |

**PLAINTIFF'S EXHIBIT 2**

Excerpt from transcript of proceeding before Judge Allegra, October 23, 2003

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| J.L. SIMMONS COMPANY,<br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br>Defendant. | ) | Docket No.: 02-173X |

Courtroom 6, Room 507
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Thursday,
October 23, 2003

The parties met, pursuant to notice of the Court, at 10:07 a.m.

BEFORE: HONORABLE FRANCIS M. ALLEGRA
Judge

APPEARANCES:

For the Plaintiff:

Christopher McNulty, Esquire
King & King
7531 Leesburg Pike, Suite 400
Falls Church, VA 22043
(703) 564-0164

For the Defendant:

Brian S. Smith, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0391

require, and basically --

MR. McNULTY: If their justice was similarly delayed for such a long period of time.

THE COURT: How does the -- let me ask you this. How does this defect that you're identifying relate to the delay? Help me on that one. I mean, I can understand how it might lead to the incorrect decision, okay --

MR. McNULTY: Right.

THE COURT: -- because, for example, a biased procedure or one which is deficient. How does it lead to the delay we're talking about between -- what's the initial date of the contract claims? Back in the early 1950s, correct?

MR. McNULTY: Yes.

THE COURT: All right. And basically, they don't recover on the claims until 1969, correct?

MR. McNULTY: Correct.

THE COURT: All right. You're not suggesting that that entire time period is attributable to this one defect, are you?

MR. McNULTY: Yes, I am.

THE COURT: Okay, go ahead.

MR. McNULTY: In the sense that but for -- it's a sort of but-for analogy that you get from --

I'm not a tort lawyer, but from what I remember from law school, you have these -- it's an analogous situation. But for the wrongful conduct of the VA Board, we wouldn't have, one, had to appeal. And we wouldn't have been enmeshed in this back and forth that was created by the Wunderlich Act and the Supreme Court decisions deciding it, and the changes in the procedures.

THE COURT: But it is sort of a but-for type of causation?

MR. McNULTY: Yes. I can't say that, you know, it was just the conduct of the VA Board --

THE COURT: That this caused a ten-year delay.

MR. McNULTY: No, it was -- this wrongful conduct caused A, and then we got enmeshed in all of this.

THE COURT: And in fact, the language about enmeshing, if I'm correct, is directly taken, again, from the Court of Claims decision. Because there's a paragraph in here that seems to say, "But fundamentally the major difficulties in which the case became enmeshed" -- you don't have to look at this, I'm just making sure -- "stemmed from the fact that it straddled, in point of time, the Wunderlich case, and

the congressional reaction thereto, culminating in the Wunderlich Act and the three occasions in Bianchi, Utah and Grace in which the Supreme Court had decided to review that act and its relationship to the Tucker Act jurisdiction of this Court."

All right, so the statement that you have made, and I think counsel for the government has also made, talking about this enmeshing, really derives, or at least was reflected in the original Simmons opinion itself.

MR. McNULTY: It's an accurate statement of the facts, Your Honor.

THE COURT: All right, so essentially, but for -- the feeling would be that but for this procedure they would have rendered a correct decision and you would have avoided all this problem.

MR. McNULTY: Yeah. When you look at when we finally got to go to trial and received a fair procedure, it was all done within three years. And that included this -- we couldn't get a final judgment from the VA Board. We had to go back to the Court of Claims and get them to pass off on it.

THE COURT: Right. Let's talk a little bit -- I know you may have some additional points on this initial interest period, but let's talk about Purvis

**Calendar No. 1605**

89TH CONGRESS } SENATE { REPORT
2d Session } { No. 1643

# CONGRESSIONAL REFERENCE CASES, U.S. COURT OF CLAIMS

SEPTEMBER 22, 1966.—Ordered to be printed

Mr. TYDINGS, from the Committee on the Judiciary, submitted the following

## REPORT

[To accompany H.R. 1665]

The Committee on the Judiciary, to which was referred the bill (H.R. 1665) to amend title 28, entitled "Judiciary and Judicial Procedure," of the United States Code to confer jurisdiction upon the Court of Claims to hear, determine, and render judgment in special jurisdictional cases, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

### AMENDMENT

Strike out all after the enacting clause and insert in lieu thereof the following:

That section 1492 of title 28, United States Code, is amended to read as follows:

**"§ 1492. Congressional reference cases.**

"Any bill, except a bill for a pension, may be referred by either House of Congress to the chief commissioner of the Court of Claims for a report in conformity with section 2509 of this title."

SEC. 2. Section 2509 of title 28, United States Code, is amended to read as follows:

**"§ 2509. Congressional reference cases.**

"(a) Whenever a bill, except a bill for a pension, is referred by either House of Congress to the chief commissioner of the Court of Claims pursuant to section 1492 of this title, the chief commissioner shall designate a trial commissioner for the case and a panel of three commissioners of the court to serve as a reviewing body. One member of the review panel shall be designated as presiding commissioner of the panel.

"(b) Proceedings in a Congressional reference case shall be under rules and regulations prescribed for the purpose by the chief commissioner who is hereby authorized and directed to require the application of the pertinent rules of practice of the Court of Claims insofar as feasible. Each trial commissioner and each review panel shall have authority to do and perform any acts which may be necessary or proper for the efficient performance of their duties, including the power of subpoena and the power to administer oaths and affirmations. None of the rules, rulings, findings, or conclusions authorized by this section shall be subject to judicial review.

"(c) The trial commissioner to whom a Congressional reference case is assigned by the chief commissioner shall proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.

"(d) The findings and conclusions of the trial commissioner shall be submitted by him, together with the record in the case, to the review panel of commissioners for review by it pursuant to such rules as may be provided for the purpose, which shall include provision for submitting the report of the trial commissioner to the parties for consideration, exception, and argument before the panel. The panel, by majority vote, shall adopt or modify the findings or the conclusions of the trial commissioner.

"(e) The panel shall submit its report to the chief commissioner for transmission to the appropriate House of Congress.

"(f) Any act or failure to act or other conduct by a party, a witness, or an attorney which would call for the imposition of sanctions under the rules of practice of the Court of Claims shall be noted by the panel or the trial commissioner at the time of the occurrence thereof and upon failure of the delinquent or offending party, witness, or attorney to make prompt compliance with the order of the panel or the trial commissioner a full statement of the circumstances shall be incorporated in the report of the panel.

"(g) The Court of Claims is hereby authorized and directed, under such regulations as it may prescribe, to provide the facilities and services of the office of the clerk of the court for the filing, processing, hearing, and dispatch of Congressional reference cases and to include within its annual appropriations the costs thereof and other costs of administration, including (but without limitation to the items herein listed) the salaries and traveling expenses of the commissioners serving as trial commissioners and panel members, mailing and service of process, necessary physical facilities, equipment, and supplies, and personnel (including secretaries and law clerks)."

SEC. 3. Section 792(a) of title 28, United States Code, is amended by adding at the end thereof the following new sentence:

"The Court shall designate one of the commissioners to serve at the will of the court as chief commissioner."

Amend the title so as to read:

A bill to amend title 28, entitled "Judiciary and Judicial Procedure", of the United States Code to provide for the reporting of Congressional reference cases by commissioners of the United States Court of Claims.

### PURPOSE OF AMENDMENT

The amendment is in the nature of a substitute bill. The substitute bill differs from the original bill, as introduced and passed by the House, in that it provides for the reference of congressional reference cases to commissioners of the U.S. Court of Claims for advisory reports to the Congress. The original bill provided for the Court of Claims itself to render binding judgment in such cases upon reference by one House of Congress.



### PURPOSE OF BILL

The purpose of the bill is to provide a procedure whereby comple issues of fact raised by claims for private relief bills may be referred t commissioners of the Court of Claims for an advisory report to th Congress.

### STATEMENT

Each year a number of claims for private relief legislation come t the Congress that raise complex issues of fact which must be resolv before the Congress can determine whether the relief requested oug to be granted. The relevant committees of the Congress have usual found that they lack the time, facilities and expertise necessary hear the evidence and make the determinations of these issu Congress has therefore traditionally sought to make use of other mea to hear these issues, while retaining for itself the prerogative of gra ing or denying the relief sought.

Until recently, the procedure followed in such cases was for o House of Congress to refer any such private relief bill to the Court Claims for a report on the facts and advisory conclusions as to wheth the relief requested should be granted. 28 U.S.C., sections 1492, 25 On the basis of the Court of Claims' report on each of the "Congr sional reference cases," Congress would then decide whether or not enact the private relief bill.

In 1962, however, in the case of *Glidden Co.* v. *Zdanok*, 370 U 530, the Supreme Court held that the Court of Claims was a court the United States within the meaning of article III of the Consti tion. It is well settled that an article III court may only dec cases and controversies, and may not render merely advisory opini that other branches of the Government are free to disregard. cordingly, the effect of the decision in *Glidden* that the Court of Cla is an article III court was to preclude the continued exercise by t court of the advisory jurisdiction on congressional reference case provided by 28 U.S.C. sections 1492 and 2509. Since the *Glid* decision the Court of Claims has regretfully declined to accept further congressional reference cases.

H.R. 1665 was introduced in order to provide an alternative me of handling congressional reference cases. The bill as passed by House of Representatives provides that the Court of Claims, u reference by resolution of one House of Congress, would have ju diction, notwithstanding any statute of limitations, to render ju ment for the amount, if any, determined to be legally or equita due from the United States. The Department of Justice ra several substantial objections to this approach to the problem, l before the House Committee on the Judiciary and before the committee on Improvements in Judicial Machinery at a hearing on June 10, 1965.

The Department put forth two major constitutional argum against H.R. 1665 in its original form: (1) It would allow only House of Congress, without Presidential approval, to perform actions traditionally requiring normal legislative procedures— ferring jurisdiction upon a court of the United States, and waivin statute of limitations for a particular case, and (2) it would call a court of the United States to perform essentially legislative func by permitting the Court of Claims to decide whether as a matt

policy and equity the United States ought to pay money to a claimant when there might not be any sum legally due.

The committee believes that there is merit in these contentions of the Department of Justice, particularly with respect to the latter of the two objections. It is difficult to justify granting to a court the power to confer what has traditionally been regarded as legislative grace. It is for Congress to decide, after being fully informed of the facts, whether the equities of a particular situation are such that rules of law of general application ought to be suspended for that one case. For these reasons, the staff of the Subcommittee on Improvements in Judicial Machinery has endeavored for the past several months to devise a substitute measure, satisfactory to both the Department of Justice and the Court of Claims, which would retain the advisory feature of present law. The amended bill would achieve this purpose and has the acceptance of the Department of Justice and the Court of Claims.

The amended bill provides for reference of claims for private relief bills by resolution of one House of Congress to the chief commissioner of the Court of Claims, who would appoint both a trial commissioner to hear the evidence and prepare suggested findings, and a panel of three commissioners of the court to sit as a reviewing body and report its findings and recommendations to the appropriate House of Congress. The report of this panel of Commissioners to the Congress is wholly advisory, and the power to grant legislative grace by passing the relief bill remains solely in the hands of the Congress. The committee is of the opinion that this approach is preferable both on constitutional grounds and for reasons of policy.

In the letter of the Deputy Attorney General to Senator Joseph D. Tydings, chairman of the Subcommittee on Improvements in Judicial Machinery, dated August 22, 1966, the Department of Justice questions the need for this legislation. The Deputy Attorney General also recommends that private relief legislation be used sparingly, and that general legislation is always preferable. Your committee feels that it is in order to make some comment about these observations.

The contention that general legislation is preferable and should be sufficient to cover all cases attributes to the legislative branch a degree of omniscience and prescience that this committee is unwilling to claim for itself. It is impossible, particularly in legislation regulating the relationship between the Government and private parties, to take account of all eventualities.

It should also be remembered that in the special area with which private relief legislation deals, factors that in other areas ameliorate the possible harsh effects of general laws may not exist. Government officials are understandably unwilling to spend the taxpayers' money in situations in which they are not clearly authorized by statute to do so, whereas in a comparable situation a private party might well decide that, although under the law his obligation is not clear, he will pay another person what he feels that equity and fair play dictate he pay. Conversely, a Government official—despite his personal view of the equities of a particular situation—will be extremely reluctant to fail to press the Government's rights under a general statute, while a private party might decide that in good conscience he should forgo what is legally his due.

In addition, in applying statutes regulating the rights and obligations of the Government the courts have less freedom to adjust their



decisions to the equities of particular situations than they do in developing the common law of relationships among private parties. For all these reasons, the committee is of the opinion that private relief legislation is both useful and necessary, and that this legislation is needed in order to facilitate congressional action on such private legislation.

The committee does agree with the Deputy Attorney General, however, that general legislation, where feasible, is preferable to private relief legislation, and that the Congress should exercise restraint in the utilization of this legislation, referring claims for private relief to the chief commissioner of the Court of Claims only when complex issues of fact must be resolved as a prerequisite for relief.

Accordingly, the committee recommends that the bill H.R. 1665, as amended, be considered favorably.

Attached hereto and made a part hereof are letters from the Department of Justice and the Court of Claims.

OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D.C., August 22, 1966.*

Hon. JOSEPH D. TYDINGS,
*Chairman, Subcommittee on Improvements in Judicial Machinery, Committee on the Judiciary, U.S. Senate, Washington, D.C.*

DEAR SENATOR TYDINGS: This is in response to your request for the views of the Department of Justice on a draft of a substitute bill for H.R. 1665, to amend the Judicial Code (title 28, United States Code) to provide for the reporting of congressional reference cases by commissioners of the U.S. Court of Claims, and for other purposes.

At the outset, it may be convenient to summarize the problems and to recount the sequence of events which have given rise to this bill.

Title 28, United States Code sections 1492 and 2509 presently provide that one House of Congress may refer any private relief bill, except a bill for a pension, to the Court of Claims, which shall then find and report to that House the facts of the case, along with conclusions sufficient to inform Congress "whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." These provisions assume that on the basis of such a report, Congress will determine whether or not to enact a private bill for the relief of the claimant.

In 1962, however, in *Glidden Co.* v. *Zdanok*, 370 U.S. 530, the Supreme Court held that the Court of Claims was a court established under article III of the Constitution. In so holding, the Court accepted the declaration Congress had made in 1953 that the Court of Claims was "a court established under article III of the Constitution of the United States" (act of July 28, 1953, sec. 1, 67 Stat. 226, added to 28 U.S.C. 171). Both the prevailing and the dissenting opinions in the *Glidden* case assumed that the effect of holding the Court of Claims to be an article III court would be to preclude it from accepting congressional reference cases under 28 U.S.C. 1492 and 2509, because of the well-settled rule that an article III court may not render advisory opinions which another branch of the Government has the power to modify or disregard. The Court of Claims has in fact declined to hear and render advisory reports on claims referred to it by Congress since the opinions in *Glidden* were handed down.

Case 1:02-cg-00173-PMA Document 49-4 Filed 09/27/2004 Page 4 of 6

H.R. 1665 was thereafter introduced in response to the continuing need for a forum in which to try the complicated issues of law and fact that are present in some private claims against the United States. That bill would have enabled one House of Congress to refer a claim to the Court of Claims, and would have directed the court itself to enter judgment for the amount, if any, which it found to be "legally or equitably due" from the United States to the claimant. The court would not have been required to report the case back to Congress.

However, the Department of Justice objected [1] to H.R. 1665 on two major constitutional grounds: (1) that it would have delegated legislative powers to a single House of Congress by permitting it to dispense with normally applicable rules of law (e.g., the statute of limitations) in referring cases for final judgment to the Court of Claims; (2) that it would have delegated essentially legislative powers to the Court of Claims by permitting that court to decide claims on an equitable (as synonymous with moral) basis, rather than on a legal basis.

Neither of those objectionable features appears in the substitute bill for H.R. 1665. The salient feature of the substitute bill is that it would provide for the reference of a claim by either House of Congress to the Chief Commissioner of the Court of Claims, who would designate "a trial commissioner for the case and a panel of three commissioners of the court to serve as a reviewing body." The trial commissioner would proceed in accordance with appropriate rules, including the rules of practice of the Court of Claims insofar as feasible, to determine the facts of the case. Specifically, these would include, in language identical to 28 U.S.C. 2509, "facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy." The trial commissioner, would, in addition, append to his findings of fact "conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." This language is also taken verbatim from 28 U.S.C. 2509. After considering the trial commissioner's report and arguments of the parties, the review panel of commissioners, by majority vote, would adopt or modify his findings and conclusions and submit its own report to the Chief Commissioner for transmission to the appropriate House of Congress. Thus the advisory function in congressional reference cases would be preserved without substantive alteration, but would be performed by non-article-III officials, and the legislative power to act in cases of that nature would remain with the Congress.

The Department of Justice has no constitutional objections to the substitute bill. However, the bill does raise several problems of lesser magnitude which we would like to call respectfully to the attention of your committee. These problems, with our suggestions for dealing with them by appropriate amendments to the bill, are as follows:

A. Although rule 56(a) of the Rules of the Court of Claims authorizes Commissioners to put witnesses under oath, there is no assurance that this rule would be among the "pertinent rules of practice" of the Court of Claims which proposed section 2509(b) of the bill

[1] See the statement on June 10, 1965, of Mr. Barnett, representing the Department of Justice, before the Subcommittee on Improvements in Judicial Machinery.



requires to be applied "insofar as feasible," nor that the administering of oaths would be among the acts, also authorized by that subsection, which may be "necessary or proper" for the efficient performance of the Commissioners' duties. By contrast, proposed section 2509(b) does explicitly confer upon Commissioners the power of subpena. We recommend that the Commissioners also be authorized explicitly by statute to administer oaths in congressional reference proceedings. Such an authorization would leave no doubt of the applicability of 18 U.S.C. 1621 (sanctions for perjury) to congressional reference proceedings, and would therefore help to insure truthful testimony in such proceedings. The bill could accomplish this purpose by a simple amendment to 28 U.S.C. 2503(a), which currently authorizes the Commissioners to administer oaths in "any suit in the Court of Claims."

B. Although proposed section 2509(b) states that the Commissioners shall have "the power of subpena," it provides for no sanction against a witness who refuses to obey such a subpena. Nor does it provide for sanctions against a witness who refuses to answer questions or otherwise to obey a proper order of a Commissioner. According to proposed section 2509(f), "[a]ny act or failure to act or other conduct by a party, a witness, or an attorney which would call for the imposition of sanctions under the rules of practice of the Court of Claims" shall merely be noted in the report of the panel to Congress. It is our recommendation that the Commissioners be given the authority, in congressional reference cases, to refer a refusal to obey a subpena to any District Court of the district in which the witness resides or may be found, for an order directing the witness to obey the subpena on pain of punishment for contempt. If the Commissioners were to have that authority, the "power of subpena" would be an effective power and the Government would be better enabled to defend such cases properly. In the interest of more efficient procedure, we also recommend that the Commissioners be given similar authority to seek a court order directing a recalcitrant witness to answer questions or otherwise to obey a proper order of a Commissioner in a congressional reference case. These purposes could be accomplished by further amendments to section 2509 (b) and (f) as they appear in the substitute bill.

C. Section 3 of the bill would delete the present provision of 2[8] U.S.C. 792(a) that the 15 commissioners "shall be subject to remov[al] by the court." We do not know whether this is a deliberate or an in[advertent] deletion, or whether the Court of Claims has been consulte[d] about it, but we do believe that its effect may well be to create doub[t] as to what changes, if any, Congress intended to make in the cond[i]tions of tenure affecting commissioners and in the removal powers [of] the court. We recommend reinstatement of the deleted provisio[n]. If it is not to be reinstated, then some clear indication of the intent [of] Congress in deleting it should be supplied.

The Department of Justice questions the need for this legislatio[n]. However, if it is the determination of the Congress that such legisl[a]tion is necessary, we strongly believe that the substitute bill which w[as] submitted to the Department by committee letter dated June 22, 196[.] should be selected because of the constitutional problems inherent [in] the bill as it passed the House.

We would recommend that if this legislation is enacted, it be us[ed] sparingly. Private relief legislation is preferential and, in fact, d

criminatory as to others similarly situated. Hence, where relief appears warranted with respect to classes of claims, general legislation is preferable.

The Bureau of the Budget has advised that there is no objection to the submission of this report from the standpoint of the administration's program.

Sincerely,

RAMSEY CLARK,
*Deputy Attorney General.*

---

CHAMBERS,
U.S. COURT OF CLAIMS,
*Washington, D.C., July 5, 1966.*

Re H.R. 1665.

Hon. JOSEPH D. TYDINGS,
*Chairman, Subcommittee on Improvements, in Judicial Machinery, Committee on the Judiciary, U.S. Senate, Washington, D.C.*

DEAR SENATOR TYDINGS: Mr. William T. Finley, Jr., chief counsel of the subcommittee, has submitted to the court a draft prepared as a substitute for H.R. 1665. He requested that the court submit its comments.

After carefully considering the substitute, it is our opinion that H.R. 1665, as passed by the House, is a much better solution of the congressional reference problem than the substitute. For a number of reasons which I shall not state in detail, the court prefers the House bill. We have also been told that H.R. 1665 is, in the view of some Congressmen, more desirable in that the final judgments which would be rendered pursuant thereto would relieve congressional committees and individual Congressmen of the extra work and pressure that often follows the receipt of an advisory report.

However, we have been informed that H.R. 1665 is not acceptable to the members of the Senate Subcommittee on Improvements in Judicial Machinery, and we respect their views. Therefore, if the Congress passes the substitute, the court stands ready to cooperate in providing the services that are called for therein to the full extent that we may do so in conformity with the decision of the Supreme Court in *Glidden* v. *Zdanok*, 370 U.S. 530. The majority of our congressional reference commissioners are experienced in the trial of congressional reference cases and we believe that they can satisfactorily discharge the duties that would be required of them under the substitute bill.

If H.R. 1665, as passed by the House, should be enacted, it is our opinion that it would not be necessary for the court to appoint additional commissioners or other personnel for the disposition of the reference cases, unless there should be a substantial increase in our caseload. This will not be true if the substitute is approved by Congress.

Under the provisions of H.R. 1665, each commissioner who would be assigned a congressional reference case would complete the trial thereof and make his report to the court for its decision, without the assistance or participation of any other commissioner. On the other hand, the substitute will require the services of three additional commissioners on each case to perform the specified review functions. Both the assigned commissioner and the reviewing panel will be required to do legal research and write opinions. We understand



that there is an accumulation of private bills that will be referred to the court when the legislation is enacted. If these cases are to be reported with reasonable dispatch under the procedure detailed in the substitute, we feel certain that the employment of four additional law clerks will be needed to assist the commissioners soon after the substitute is approved.

Aside from the additional law clerks mentioned above, it is too early to predict the extent to which the new duties to be performed by the commissioners under the substitute proposal will delay the disposition of the regular cases filed with the court, or whether the appointment of additional commissioners and other personnel will be needed. Therefore, we believe that the substitute should be amended so as to provide a clear authorization for such additional appropriations as actual experience shows to be necessary for the handling of the congressional reference cases. To that end, we respectfully request that the word "absorb" appearing in the fourth line of sec. 2(g) of the substitute, be stricken and that the word "include" be inserted in lieu thereof.

Sincerely yours,

WILSON COWAN,
*Chief Judge.*

CHANGES IN EXISTING LAW

In compliance with subsection (4) of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## TITLE 28, UNITED STATES CODE

**§1492. Congressional reference cases.**

[The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under other Acts of Congress.]

*Any bill, except a bill for a pension, may be referred by either House of Congress to the chief commissioner of the Court of Claims for a report in conformity with section 2509 of this title.*

**§2509. Congressional reference cases.**

[Whenever any bill, except for a pension, is referred to the Court of Claims by either House of Congress, such court shall proceed with the same in accordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.]

*(a) Whenever a bill, except a bill for a pension, is referred by either House of Congress to the chief commissioner of the Court of Claims pursuant to section 1492 of this title, the chief commissioner shall designate*

*a trial commissioner for the case and a panel of three commissioners of the court to serve as a reviewing body. One member of the review panel shall be designated as presiding commissioner of the panel.*

*(b) Proceedings in a Congressional reference case shall be under rules and regulations prescribed for the purpose by the chief commissioner who is hereby authorized and directed to require the application of the pertinent rules of practice of the Court of Claims insofar as feasible. Each trial commissioner and each review panel shall have authority to do and perform any acts which may be necessary or proper for the efficient performance of their duties, including the power of subpoena and the power to administer oaths and affirmations. None of the rules, rulings, findings, or conclusions authorized by this section shall be subject to judicial review.*

*(c) The trial commissioner to whom a Congressional reference case is assigned by the chief commissioner shall proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.*

*(d) The findings and conclusions of the trial commissioner shall be submitted by him, together with the record in the case, to the review panel of commissioners for review by it pursuant to such rules as may be provided for the purpose, which shall include provision for submitting the report of the trial commissioner to the parties for consideration, exception, and argument before the panel. The panel, by majority vote, shall adopt or modify the findings or the conclusions of the trial commissioner.*

*(e) The panel shall submit its report to the chief commissioner for transmission to the appropriate House of Congress.*

*(f) Any act or failure to act or other conduct by a party, a witness, or an attorney which would call for the imposition of sanctions under the rules of practice of the Court of Claims shall be noted by the panel or the trial commissioner at the time of the occurrence thereof and upon failure of the delinquent or offending party, witness, or attorney to make prompt compliance with the order of the panel or the trial commissioner a full statement of the circumstances shall be incorporated in the report of the panel.*

*(g) The Court of Claims is hereby authorized and directed, under such regulations as it may prescribe, to provide the facilities and services of the office of the clerk of the court for the filing, processing, hearing, and dispatch of Congressional reference cases and to include within its annual appropriations the costs thereof and other costs of administration, including (but without limitation to the items herein listed) the salaries and traveling expenses of the commissioners serving as trial commissioners and panel members, mailing and service of process, necessary physical facilities, equipment, and supplies and personnel (including secretaries and law clerks).*

**§ 792. Commissioners.**

(a) The Court of Claims may appoint fifteen commissioners who shall be subject to removal by the court and shall devote all of their time to the duties of the office. *The Court shall designate one of the commissioners to serve at the will of the court as chief commissioner.*

○

**CONGRESSIONAL REFERENCE**
**To The**
**UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Congressional Reference No. 02-173X**

---

| | | |
|---|---|---|
| **J. L. SIMMONS COMPANY, INC.** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge Firestone** |
| **THE UNITED STATES** | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S EXHIBIT 4**

# SUBCOMMITTEE ON ADMINISTRATIVE OVERSIGHT AND THE COURTS

## STANDARDS TO BE USED IN ADJUDICATING PRIVATE CLAIMS BILLS

The right to petition for redress of grievances is guaranteed by the first amendment to the Constitution. When called upon to decide whether relief should be granted persons seeking redress of grievances, the subcommittee is guided by principles of equity and justice. In connection with its jurisdiction over claims, the subcommittee considers private bills extending relief to individuals who have no other existing remedy. The task of the subcommittee is to determine whether the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an individual.

1. The meeting of this subcommittee shall be held upon appropriate notice by the chairman of the subcommittee.

2. No consideration shall be given to any bill until request is made by the author or sponsor, who shall file sufficient evidence in its behalf.

3. No private bill shall be considered if an adequate judicial or administrative remedy exists, or where court proceedings are pending for the purpose of adjusting or changing the status of the beneficiary.

4. No favorable consideration shall be given to any private bill until the proper department or agency has submitted a report. The subcommittee will obtain such report upon request.

5. Upon receipt of reports from the Departments, private bills shall be scheduled for subcommittee consideration in the chronological order of their introduction, except that priority shall be given to bills introduced earliest in any of the previous Congresses.

6. Bills which have been previously tabled shall not be reconsidered unless new evidence is introduced showing a material change of the facts known to the subcommittee. In the event of a request for reconsideration the subcommittee shall, insofar as practicable, dispose of such request at the first meeting of the subcommittee following receipt of such request.

NOTE: The number of bills referred to the subcommittee makes it impossible to continue to review cases which were the subjects of unfavorable consideration at a prior time. A case considered by the subcommittee and rejected at a previous consideration will be viewed in the same light as a case which has been adversely decided by a court.

7. The subcommittee shall not consider any claim filed with the Office of Workmen's Compensation Programs, Department of Labor, considered on its merits and disallowed; or any bill awarding or increasing compensation to an employee or dependents in lieu of that prescribed by chapter 81—Compensation for Work Injuries, of title 5, U.S. Code, or otherwise interfering with the provisions of that chapter, except bills to waive the limitations of time contained in pertinent sections of the act.

NOTE: Bills to waive statutes of limitation as they apply to this subject area, may be waived upon two-thirds vote of this subcommittee. As a matter of policy, these bills will include, if approved by the subcommittee, a provision precluding the receipt of benefits for any period prior to their date of approval. In addition, such bills will include a limitation requiring presentation of claims within 6 months from the date of approval. The showing required by the subcommittee to warrant favorable consideration of such a bill is at least a prima facie case, coupled with justification for failure to file with the time prescribed by the act. Statute of limitations problems are the only aspects of employee compensation cases that will be entertained by the subcommittee. The subcommittee has concluded that if the relief now extended to regular government employees or persons entitled to benefits is inadequate under the general law, the remedy must come by general law, not by enactment of discriminatory private legislation in selected cases.

**CONGRESSIONAL REFERENCE**
**To The**
**UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Congressional Reference No. 02-173X**

---

| | | |
|---|---|---|
| **J. L. SIMMONS COMPANY, INC.** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge Firestone** |
| **THE UNITED STATES** | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S EXHIBIT 5**

U.S. HOUSE OF REPRESENTATIVES

# COMMITTEE ON THE JUDICIARY

SUBCOMMITTEE ON IMMIGRATION AND CLAIMS

ONE HUNDRED SEVENTH CONGRESS

## RULES OF PROCEDURE FOR PRIVATE CLAIMS BILLS

## RULES OF PROCEDURE FOR THE CONSIDERATION OF PRIVATE CLAIMS BILLS

In connection with its jurisdiction over claims, the subcommittee considers private bills extending relief to individuals who have no other existing remedy. The right to petition for a redress of grievances is guaranteed by the first amendment to the Constitution. When called upon to decide whether relief should be granted to persons seeking redress of grievances, the subcommittee is guided by principles of equity and justice. The task of the subcommittee is to determine whether the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an individual.

House rule XI provides that the rules of the House are the rules of its committees and subcommittees so far as they are applicable to committee and subcommittee functions. That rule contains specific provisions concerning committee operation and further, in rule XI (2), provides for written committee rules which are to be consistent with the rules of the House. Subject to these requirements, each committee is free to prescribe additional rules it finds necessary to conduct its business. This is recognized in Judiciary Committee rule I which expressly incorporates the applicable House rules. The balance of the committee's rules are addressed to subjects and situations which, from a procedural standpoint, are peculiar to it: Days of the meetings; publication of agenda; hearings; proxy voting; broadcasting; jurisdiction, powers, and duties of standing subcommittees; and non-legislative reports. Committee rule VII provides that—

> * * * Subcommittee chairmen shall set dates for hearings and meetings of their respective subcommittees after consultation with the chairman and other subcommittee chairmen with a view toward avoiding simultaneous scheduling of full Committee and subcommittee meetings or hearings whenever possible.

The Subcommittee rules set out in this booklet implement these purposes and principles. These rules have been developed based upon the past exercise of its jurisdiction over private legislation and are intended to im-