**CONGRESSIONAL REFERENCE**
**To The**
**UNITED STATES COURT OF FEDERAL CLAIMS**

**Congressional Reference No. 02-173X**

| | | |
|---|---|---|
| **J. L. SIMMONS COMPANY, INC.** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge Firestone** |
| **THE UNITED STATES** | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S EXHIBIT 1**

Excerpts from transcript of proceeding before Judge Allegra, October 23, 2003

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| J.L. SIMMONS COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No.: 02-173X |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom 6, Room 507
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Thursday,
October 23, 2003

The parties met, pursuant to notice of the Court, at 10:07 a.m.

BEFORE: HONORABLE FRANCIS M. ALLEGRA
Judge

APPEARANCES:

For the Plaintiff:

Christopher McNulty, Esquire
King & King
7531 Leesburg Pike, Suite 400
Falls Church, VA 22043
(703) 564-0164

For the Defendant:

Brian S. Smith, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0391

Unfortunately that hasn't come to pass. As you know from the discussion that we've had previously, we have tried repeatedly to get a bill through Congress and we were finally successful.

Anyway, so we looked at this and I didn't really appreciate, initially, the government's argument about this. To me it just seemed obvious that the conduct was wrongful, so I didn't really begin to appreciate what the government was saying until I got their response to our motion for the favorable hearing officer's report.

And as I understand it, it seems to me that they're saying, oh well, the conduct's not really wrongful because you have to look at it back in the 1950s and this is just the way things were done, and everybody was doing it, and so therefore it's not wrongful. I don't think that's a very good argument.

THE COURT: Well, let me -- before you go too far with that, I just want to make sure, and I know we've had these discussions before, so forgive me if we're covering ground a second time. It does appear that there is a distinction between wrongful and just simply erroneous, correct?

All right, so if we didn't have some of the allegations here, or maybe more than allegations here

in terms of what happened with the agency review process, but that the agency had simply improperly denied the claims at that time, that wouldn't be wrongful, would you agree?

MR. McNULTY: If they improperly -- I mean, if there was just a --

THE COURT: In other words, the process and procedures were perfectly fine but there was some disagreement about what the contract called for, there was some disagreement about what expenses occurred.

MR. McNULTY: I would agree.

THE COURT: In other words, you don't necessarily equate the word "wrongful" with simply erroneous?

MR. McNULTY: No.

THE COURT: Okay.

MR. McNULTY: No, it's our position, the Plaintiff's position, that the procedures were wrongful, regardless of whether you viewed them in terms of today or yesterday, and I'm going to get into that a little more specifically in just a minute. I think that even in the perspective of yesterday they were wrongful and that's why they've been changed. That's why the court overturned the VA's initial decision.

But I'm going to get into that with some specificity, Your Honor.

THE COURT: Go ahead.

MR. McNULTY: Because as I began to appreciate what the government was saying and I discussed it with my cocounsel, Paul McNulty, my father, who tried the case during the sixties, he said I should take a look at the legislative history of the Wunderlich Act because it was his recollection that there was a great deal of discussion about this sort of thing.

And so I did, and in getting ready for this oral argument today, and I found it to be quite enlightening, and I think when you look at it you'll agree that it's clear that the conduct was wrongful, and even then people viewed it as being wrongful.

When I looked into it, I discovered that the law before the Wunderlich case, which is 342 U.S. 98, which was decided in 1951, was that administrative decisions were reviewed when they were shown to be arbitrary, capricious or so grossly erroneous as to imply bad faith, notwithstanding the fact that the parties had contracted that all matters of disputed fact might be decided by one of the parties to the contract, the government.

Now, in sort of summing that up, there's a really nice decision from the Court of Claims, Palace Corporation v. United States, which is 124 Ct. Cl. 545. And at page 549 of that decision, the court said, "Until the time of the decision in that case," referring to the Wunderlich case, "this Court had reviewed the contracting officer's decision when it was shown to be arbitrary, capricious or so grossly erroneous as to imply bad faith," the standard I just stated, "notwithstanding that the parties had contracted that all matters of disputed fact would be decided by one of the parties to the contract. Such a provision, we had understood, called for the highest good faith on the part of the interested party making that decision."

That was the law and it had been that way for a long time prior to the Wunderlich case. And in 1951 the Supreme Court sort of upset the applecart with the Wunderlich case, a case which, by the way, coincidentally, my firm handled. We won it in the Court of Claims and lost it in the Supreme Court. And there was a great hue and cry, and in response the Congress passed the Wunderlich Act in 1954, which was two years before this initial VA proceeding in this case. And the Wunderlich Act restored the former law

and the standard of review regarding arbitrary, capricious or grossly erroneous so as to imply bad faith. But it specifically added the requirement that the administrative decision be supported by substantial evidence.

And you say well, now why did they do that? Here you had this long history of the law in the United States prior to Wunderlich and then the Wunderlich Act is supposed to restore the law, but they've added something. And why was this added?

Well, if you look at the legislative history you'll discover why. And in the House Report Number 1380, which is part of the legislative history, it's 83rd Congress, second session. This report is dated March 22, 1954, and it's entitled Finality Clauses in Government Contracts, and at pages four to five of that report, the House Committee stated as follows:

"The inclusion of the standard `not support by substantial evidence' should also correct another condition arising out of the lack of uniformity between the various departments and agencies concerned in the appellate hearing procedures under the disputes clause. It has been brought to light in public hearings that it is the exception rather than the rule that contractors in the presentation of their disputes

are afforded an opportunity to become acquainted with the evidence in support of the government's position.

"It is believed that if the standard of substantial evidence is adopted," -- as it was -- "this condition will be corrected, and that the records of hearing officers will hereafter contain all of the testimony and evidence upon which they have relied in making their decisions. It would not be possible to justify the retention of the finality clauses in government contracts unless the hearing procedures were conducted in such a way as to require each party to present openly its side of the controversy and afford an opportunity of rebuttal."

Now, when we look at the rest of the legislative history, which conveniently, my firm prepared this book back in the '50s -- we were very active in the passage of the Wunderlich Act and I've reviewed all of that, and I've gone through it, and the only testimony that I can find that appeared in Congress to which they appeared to be eluding when they say it's come to light, is testimony that was presented by Mr. Gaskens of my firm at the time, who appeared.

And when you review his testimony, which appears at the beginning of page 77 of this same

hearing report, you will see that he is referring specifically to the Veteran's Administration and its ex parte procedures. And he also refers to the Interior Board, which is the board that the Wunderlich case came out of. And he specifically cites those two boards. They both have these -- had, in that day, these ex parte procedures. And there's no other reference in any of the testimony of dozens of witnesses that I could find in the legislative history that refer to this.

Now, I think it's a bit hyperbolic, that statement, that they say it's the exception rather than the rule, because elsewhere in the testimony there is -- I mean, I'm sorry, in the legislative history -- and I'm specifically referring now to Senate Report Number 1670, which is dated April 4, 1952.

In that report there's three witnesses who appear beginning at page 93, and they are represented as from the ASBCA, the Engineer Corps Board, and the -- the Corps of Engineers Board, and the General Services Administration. And they described in their testimony before Congress their procedures that existed at that time, which was 1952. And their procedures, as I reviewed them, appeared to be

remarkably similar to the procedures that are essentially in force today before all of the boards.

THE COURT: Is there some reason why this wasn't in your reply brief?

MR. McNULTY: I wasn't aware of it at the time, Your Honor. Until I was discussing with him in preparing for this oral argument the government's argument that oh, it was okay because everybody was doing it back then. And he said hey, you ought to take a look at the Wunderlich Act.

THE COURT: Did you give Mr. Smith indication that you were going to rely on these authorities prior to today?

MR. McNULTY: No. No, Your Honor.

THE COURT: Before you go too much farther, what I'm going to want you to do is to file a supplemental memorandum --

MR. McNULTY: All right.

THE COURT: -- that summarizes your views on this, to which I'm going to give Mr. Smith an opportunity to respond.

MR. McNULTY: Yes, sir.

THE COURT: So that if he wants to beyond today, he can go back and take a look at the same legislative history and see if there's anything there

example, to post-Wunderlich Act procedure but perhaps the pre- ones.

It wouldn't be a ridiculous situation these days, and this case, in fact, is an indication of that, but unfortunately some cases took a very long time to gestate at that point, so maybe it's possible that the agency there was rendering rulings that were reviewed in Bianchi that predated the effective date of the Wunderlich Act. So I'll go take a look at that.

MR. McNULTY: All right.

THE COURT: All right, so what we've been talking about gets us to the first component, in other words, is there a wrongful action that supports interest?

MR. McNULTY: Right, and I have just one more thing I'd like to add on that.

THE COURT: Sure.

MR. McNULTY: The ex parte nature of the proceedings aren't the only wrongful act that we pled. We also pled this dual role that one member of the panel played.

THE COURT: Sure.

MR. McNULTY: And that, I also found there.

THE COURT: You don't think that that's

being referred to in these references that I pulled from the opinion?

MR. McNULTY: It may very well be, but there's some further evidence that I discovered, again, after we filed the reply brief, in a May 1961 article that appeared in the *Journal of the Bar Association of the District of Columbia*, and it was written by a man named John Krogan who I'm informed was an attorney at the VA at the time. And in this article he discusses the history of the VA Board and how they've had to change their procedures.

But at page 224 and 225 of that article, he says something that very specifically relates to the wrongful nature of this dual role. He says that, "In the nomination" -- beginning at the bottom of page 224, he states, "In the nomination of the initial membership of the appeals committee, moreover, a paradoxical situation was caused by the unwitting designation of a contracting officer as chairman of the unit. However, it hastily being sensed that this forensic faux pas might cast the chairman in the role of being not without bias, the error was rectified by a subsequent memorandum."

And then there's a footnote, footnote number

5, and if you look down at the footnote, you'll see that that memorandum is dated in 1946. So in 1946 the VA Board was aware that they shouldn't have people sitting and hearing the appeal who were involved in the original decision. They knew that was wrong in 1946, but ten years later, in 1956, they did it in the Simmons case.

THE COURT: But if we look at the Simmons opinion again, I see references to the ex parte portion of it. In other words, it appears that that court was not just focusing on the way the evidence was presented, but also on the fact that there was this dual role being played here. At least I see some glancing reference to it, recognizing --

MR. McNULTY: Well, all I could say in response to that, Your Honor, is that if the VA Board itself knew it was wrong, then why shouldn't the court also have found it to be wrong? They themselves knew, according to this article, in 1946 they shouldn't be doing that, and when they did it they corrected it.

Now, the article is silent as to why it happened again in 1955 and '56, but the point I'm trying to make is they knew it was wrong and they did it, and so regardless of what the Supreme Court majority or the Court of Claims says about, well, you