IN THE UNITED STATES COURT OF CLAIMS

J. L. SIMMONS COMPANY, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 186-59

(Filed March 18, 1964)

PLAINTIFF'S MEMORANDUM IN RESPONSE TO COMMISSIONER'S ORDER OF OCTOBER 7, 1963

On October 7, 1963, the Commissioner issued an Order in the above-entitled case, accompanied by a thoughtfully prepared Memorandum Opinion, in which the procedural problems posed by the Bianchi decision were held up for examination and comment. As plaintiff interprets the Commissioner's Memorandum Opinion, discussion is desired under five principal categories, which are:

1. In what respects did the Board err in reaching its legal conclusions?

2. If the Board's factual conclusions related either to a claim over which it had no jurisdiction, or were pertinent primarily to a decision on a

question of law, are they, since Bianchi, beyond the reach of the disputes clause and therefore inconclusive?

3. Did the conduct of the Board in receiving and acting upon advice and assistance of an adverse nature from witnesses whom plaintiff was not permitted to confront and cross-examine, constitute a Wunderlich defect, and consequently render inconclusive the Board's factual determinations?

4. Was the Board's decision supported by substantial evidence within the meaning of the Wunderlich Act?

5. What procedures does plaintiff ask the Commissioner to adopt?

Each of the above will be considered.

## 1. In What Respects Did The Board Err In Reaching Its Legal Conclusions?

In par. 2, subpar. (a) of his order, the Commissioner directs that plaintiff specify the instances in which the decision of the Board was erroneous as a matter of law. The errors of law which the Board committed largely revolve around the application of legal principles to erroneous conclusions of fact, which conclusions in turn were based upon information that the Board received from witnesses who plaintiff was not permitted to confront. They were the following:

1. With respect to claims which fell within its jurisdiction:

(a) The Board erred as a matter of law in not paying plaintiff, and its subcontractor MacArthur, for all of the additional expense which they

peril in differentiating between questions of law and fact. Such distinctions have troubled the courts for years, to the extent that they are sometimes conveniently referred to as mixed questions of law and fact. A contractor should not be subjected to this peril in his effort to achieve a settlement which would obviate the necessity of suit in this Court.

From what has been said, no legal reasons exist under Bianchi or otherwise, which should cause this Court to depart its historical function of deciding the facts necessary for its own legal conclusion, or of entertaining jurisdiction of claims which the administrative boards have declared are beyond the reach of the disputes clause. It follows that none of the statements of alleged fact made by the Board with respect to any of plaintiff's claims which are based upon, or arise out of, a breach of contract, are conclusive upon plaintiff, and that plaintiff should be permitted to have a trial de novo upon all of such claims.

3. Did The Conduct Of The Board In Receiving And Acting Upon Advice And Assistance Of An Adverse Nature From Witnesses Whom Plaintiff Was Not Permitted To Confront And Cross-Examine, Constitute A Wunderlich Defect, And Consequently Render Inconclusive The Board's Factual Determinations?

Plaintiff's position under this heading is that the Board did receive and act upon advice and assistance of an adverse nature from witnesses whom plaintiff was not permitted to confront and cross-examine, and it will

in this Memorandum refer to evidence that this was done. Plaintiff insists that such procedure constituted a Wunderlich defect and consequently deprived all of the Board's findings of any conclusiveness that they might otherwise have possessed.

In advancing this argument, plaintiff does not agree that it is necessary to establish a Wunderlich defect with respect to any of the factual findings which pertain to its claims based upon breach of contract, for under Heading 2 above, it has explained why it does not consider as conclusive the administrative findings of fact made with respect to the resolution of questions of law, or made with respect to claims for breach of contract which the Board admittedly had no jurisdiction to allow.

However, in the event that the Commissioner rules adversely to plaintiff on the argument advanced under Heading 2, the same Wunderlich defect exists with respect to the findings pertaining to breach of contract as exists with respect to the claims over which the Board admittedly had jurisdiction, and because of such defect, none of the Board's findings of fact are conclusive.

Plaintiff spent many thousands of dollars in preparation for the hearing and presentation of its claims before the Board. Nine witnesses for plaintiff journeyed to Washington andover a long period of time presented oral testimony in an open hearing before the Board, the transcript of such

testimony approximating 1400 pages in length (Ex. 6 to Board's decision). During their examination by counsel, there were offered in evidence hundreds of pages of exhibits in substantiation of their contentions (App. Exs. 1-286). Plaintiff's witnesses were not only examined by plaintiff's counsel, but were also subjected to cross-examination and inquiry by the Board itself (Tr., Ex. 6 to Board's decision, pp. 45-46; 68-70; 99-101; 105-106; 107; 111-112; 114-116; 117; 119; 155-156; 162; 166-170; 197-198; 320; 324; 330-331; 332; 334; 341; 345-346; 359-360; 368; 370-371; 378; 380; 387; 388-389; 391-392; 397-398; 410-413; 416-417; 420-423; 428-429; 432-433; 438; 446-450; 461-462; 467-470; 477; 505-509; 510; 515-517; 523; 524-525; 527; 562-563; 574; 607-608; 645; 658; 708-713; 739-743; 751-753; 793-794; 797; 807-808; 817; 831N -831 O; 851-854; 855-856; 872; 899-900; 940-941; 953-954; 985; 1014-1015; 1016; 1017; 1035-1036; 1107-1109; 1133; 1135-1137; 1142-1143; 1148-1149; 1151-1152; 1164; 1166-1171; 1194-1195; 1208-1210; 1221-1222; 1228-1234; 1274; 1313; 1353-1354; 1375-1381; 1406-1408).

At the conclusion of the hearings on November 15, 1956, no Government witness had been called, and this will be evident to the Commissioner from the transcript of record. Plaintiff filed a 300-page brief in which the evidence received by the Board was carefully collected as to subjects, page citations to the transcript of testimony being supplied. This brief appears as Ex. 7 to the Board's decision. The Board's decision was rendered in 1958.

In the proceedings before the Board, plaintiff presented the oral testimony of two eminent practitioners in the science of soils mechanics, Dr.

Rutledge of the New York firm of Moran, Proctor, Mueser and Rutledge, and Dr. Peck of the University of Illinois. Their testimony appears at pp. 964-1171 and pp. 1171-1275 of the transcript of testimony. It became evident to the plaintiff that the Board intended to receive a report from, and to confer with, another expert in soils mechanics, Dr. Housel, and to do so at a time when plaintiff and its counsel would not be present. Plaintiff accordingly addressed a letter to the Board on January 23, 1958, stating in part as follows:

> We understand the Board now has received the report of Professor Housel in the above matter, and we accordingly request that a copy of the same be made available to us as attorneys for the contractor. We also understand that the Board intends to conduct conferences with Professor Housel with respect to such portions of the report as the Board may not fully comprehend, and we request that we be afforded an opportunity to participate in those discussions.

On February 3, 1958, the Board replied that it did not see that any useful purpose would be served in making the report available prior to the time that it had drafted its proposed findings, and further stated:

> With respect to your request to participate in discussions with Professor Housel, you are advised that any meetings had with this Board and Professor Housel will be in the nature of informal conferences, not stenographically-reported hearings, and likewise, it is not seen where your participation would be appropriate or that any useful purpose would thereby be served, again bearing in mind the provisions of our regulations respecting the right of rebuttal afforded appellants.

These letters do not appear with the papers submitted to the Commissioner by the Board, and the same are accordingly included in a file of exhibits attached to this Memorandum, being designated Plaintiff's Memorandum Exhibits Nos. 2 and 3 respectively.

After the conclusion of the hearings on November 15, 1956, the plaintiff knows of at least two reports that Dr. Housel made to the Board, the same being Report No. 3 dated August 1957, and Report No. 4 dated January 1958, which are referred to as Exhibits 3 and 4 to the Board's decision, and appear in the Tableof Board Exhibits accompanying the decision. Accompanying Exhibit 4 were also Exhibits 4A, 4B, 4C, 4D, 4E, 4F, 4G, 4H, 4I, 4J, 4K, 4L, 4M, 4N, 4P, 4Q and 4R, all of which were received by the Board after the hearing.

Housel's reports were an expression of views adverse to the position taken by the plaintiff with respect to the inadequacy of the Government's design, and without laboring this Memorandum by a detailed discussion of the points of difference, it may be stated that the testimony of Drs. Peck and Rutledge was for all practical purposes ignored by the Board, while the views of Dr. Housel were either quoted, or referred to, extensively in the decision. Report No. 4, dated January 1958, was either quoted, or referred to, by the Board with approval at pp. 42, 53, 55, 58, 59, 67, 70, 71, 77, 92, 93, 94, 102, 110, 112, 124, 125, 126, 126A and 150 of the Board's decision. Report No. 3 by Housel, dated August 1957, was also quoted or referred to with approval at pp. 67 and 180 of the Board's decision.

Housel's lack of objectivity in this matter was fully established as a result of the discovery that was permitted by the Court after suit was instituted, during which there was brought to light a letter dated July 4, 1957 from Housel to the Director of Construction written with respect to Report No. 3, in which he stated that he did not want the report released until he had been advised by the Veterans Administration's attorney that "there is

nothing detrimental to the Veterans Administration's interest in what I have said and the way I have said it." He also suggested that the Veterans Administration "feel free to be quite critical of the report and not hesitate to make any suggestions which you feel to be to the best interest of the Veterans Administration." This letter, which is attached hereto as Plaintiff's Memorandum Exhibit No. 4, recited in part:

> Enclosed herewith are three (3) copies of the above report which are being submitted to you for preliminary review by the Veterans Administration. I would like to make it clear that I am not releasing this report or submitting it officially at this time. I do not wish to make it available to parties of interest outside the Veterans Administration, until it has been carefully examined and until the Veterans Administration attorney's can advise me that there is nothing detrimental to the Veteran's Administration interest in what I have said and the way in which I have said it. Also, I am not unmindful of the fact that Ralph Peck is now being sued for a million dollars arising from some derogatory statements he made regarding a certain contractor * * *.
>
> * * * I hope that you and your associates will feel free to be quite critical of the report and not hesitate to make any suggestions which you feel to be to the best interest of the Veterans Administration. * * *

This letter explains more eloquently than counsel could why the hearing procedure followed by the Veterans Administration was a travesty upon administrative justice and a Wunderlich defect. However, more the same is to be found in this case.

The plaintiff's witnesses, as the record will reveal, include the persons who had direct charge of the operations and who spoke on the basis of personal knowledge as to what occurred. No such witness, as far as the

plaintiff knows, was ever consulted by the Board. Instead, the Board relied upon a 267-page report prepared by Mr. Lane, an engineer in the Washington office of the Veterans Administration (Ex. 10 to the Board's decision), and a report prepared by Dr. Feld, who was also a consultant to the Board, and whose participation in this case began after all of the hearings had been concluded (Ex. 11 to the Board's decision). These persons were not called before the Board in plaintiff's presence, nor was the plaintiff given an opportunity to be present at any time when they discussed matters with the Board, or to confront them and question them concerning thehundreds of opinions which they saw fit to express in their reports to the Board. This type of material was the only material which the Board has accredited in arriving at its conclusions.

The obvious malice which Mr. O. B. Lane had for plaintiff and its attorney clearly showed through in his report. Mr. Lane was a career employee of the Veterans Administration who worked in the same building as the one in which the hearings were conducted by the Board. It would be idle to pretend that he was not available to come to the Board and set forth his views at the time that the hearings were in progress. Instead, Mr. Lane was given the opportunity to write a lengthy diatribe some 267 pages in length, through which runs a curious mixture of vindictiveness and rhetoric. It is impossible to separate the two, but some of the highlights of his statements are now referred to, and the Court is asked to keep in mind that the

statements are supposed to come from a person whose view of the problem is sufficiently detached to justify acceptance of his version and opinion without the opportunity of cross-examination.

When the Contracting Officer decided to make the change from pedestal type to composite type piles, Mr. Lane states that the contractor "created a web of circumstances which had the effect of bringing undue pressure to bear upon design and construction officials of V.A." (p.5). When the plaintiff discussed the meaning of the word eccentricity as used in the specifications, this was "The obvious strategem * * * to present so many eccentric interpretations of 'eccentricity' that the Board would be distracted" (p.16). Mr. Lane advised the Board that in his report he would not attempt "to meet each and every mote of all the dust that has been raised in this record" (p.17). With respect to plaintiff's proof that it was the Government who first suggested the use of the composite pile that failed, this is regarded as having "no purpose except to decoy and divert attention away from the contract" (p. 18). With respect to the testimony of Doctors Rutledge and Peck before the Board regarding the soils mechanics phase of the case, this is characterized as "an extended detour into the field of theoretical soil mechanics, the likes of which could practically be guaranteed to befuddle and confuse the average engineer, not to mention the average layman" (p.21). The plaintiff's whole presentation was permeated with disorder and confusion and "much dependence is put upon confusing the opposition; and the Board" (p.22). Possibly Mr. Lane

rises to his greatest heights in this statement at p. 22:

> The manner in which persons and things are held up to the Board in first one light, then in another, first in one posture and then in another, inevitably brings to mind the trick mirrors in an amusement palace. This record presents you with twisted and deformed reflections of persons, things and circumstances and then this record takes you back again and again over the same path, apparently with the intent of making the weird and uncanny reflections take on substance - of making the distorted pictures seem like real things.

According to Mr. Lane, the Board in many instances has "been told only part of what is right and this in such an adroit manner as to leave a wrong impression" (p. 170). Actually, Mr. Lane says, the selection of composite piles was not a free choice by the Government, "but instead was brought about by the delays and deceiving contentions practiced by the Appellant" (p. 190).

Plaintiff, it seems, also neglected important duties "whether it was out of cupidity or stupidity, either way it clearly violated both his contractual and moral obligations" (p. 192). There was no call, said Mr. Lane, "for the Board to be taken on an extended excursion into the area of theoretical soils mechanics, a 'never-never' land, where expert regularly disagrees with expert, where the general engineer is sure to become confused and where the non-engineer can surely become hopelessly lost" (p. 208). Plaintiff's work, according to Mr. Lane, was "dilatory, slipshod, incompetent and negligent" (p. 229).

The foregoing are not intended to indicate all of the instances where Mr. Lane revealed his personal side in this controversy -- there are many

more. Some of the facts which he recited in his report are undoubtedly correct, while others are grossly incorrect as are the opinions which he reached from such incorrect premises and from his obvious personal dislikes in this case. The difficulty is that all of the opinions that he has advanced, whether on a correct or incorrect factual basis, are clearly influenced by his preconceived idea that the contractor in presenting this claim was doing an immoral thing, and that the Government was either deceived or had no responsibility whatever for the design of the pile which it ordered the plaintiff to install.

It is impossible in a proceeding such as this to trace through in writing all of the disclosed and undisclosed reasons for Mr. Lane's opinions. Opinion evidence, coupled with so egotistical a manner of presentation, can only be brought to its proper perspective by confrontation and cross-examination. Yet Mr. Lane was protected against any such test of the validity of his conclusions and instead, his unopposed word, stated exactly in the terms he wished to use, was accepted as the basis for the Board's findings. The regularity with which his views are either cited or quoted by the Board can be judged from the number of times this occurs in the Board's findings, i.e., pp. 5, 22, 41, 58, 68, 69, 67-74, 75, 80, 81, 84, 85, 88-90, 94, 95, 97, 100, 105-109, 118, 123, 148, 149, 172, 176, 177.

The procedures followed by the Veterans Administration Board (and later employed in this case) were made known to the Committee on the Judiciary

of the House of Representatives at the time it was considering the Wunderlich legislation, and such procedures were condemned at that time by Congress, and were again later condemned by the Supreme Court in Bianchi. The Court is first asked to consider the following testimony in the printed hearings before Subcommittee No. 1 of the Committee on the Judiciary of the House of Representatives, 83d Congress, on H. R. 1839 and S. 124, H. R. 3634 and H. R. 6946, the Wunderlich legislation.

At p. 78:

> There is a very valid need for legislation in this field for a reason that has not been discussed before the committee up to the present time. This relates to the treatment which the contractors receive when they appear before these various departments and agencies that have the administration of Government contracts. Mr. Niederlehner, the representative for the Department of Defense, related yesterday that in his Department they had a hearing procedure. Well, that is true. They do have a hearing procedure, but it is the only department to my knowledge which even closely approximates or approaches the form of a quasi-judicial review in these matters. Let us take, for instance, the Veterans' Administration, which presently is engaged in letting millions of dollars worth of work involving the construction of veterans' hospitals. Very substantial disputes arise in connection with such work. I am presently interested in one now where the amount of the claim is approximately $2 million. Several subcontractors have failed as a result of the financial hardship that was imposed by the contracting officer's ruling.
>
> But what processes of judicial review do we have before the Veterans' Administration? It is briefly this: We go with our witnesses to a board which they have constituted. We put our witnesses on the stand and we ask them questions. The board will ask questions from time to time, and when our witnesses have stopped speaking the hearing is ended. There is no provision whatever for the appearance of any Government witnesses. The contractor is given no opportunity to cross-examine any Government witnesses. At the end of the hearing, sometime later the

> contractor is supplied with a written statement purporting to set forth what the hearing board proposes to recommend to the head of the department as his administrative decision, and we are invited to make any objections to it. Well, we can make those objections, but we do not know what information the board has obtained from the contracting officer. The Board frankly admits that it will confer with the contracting officer regarding this dispute, but we will not be present. I can produce decisions where the board stated that it had conferred with the contracting officer and had been advised certain things. I can recall one case where they referred to an exhibit that they had obtained from the contracting officer. We wrote, asking for the exhibit, but we have never gotten the exhibit. That is a situation which exists with respect to hearings before the Veterans' Administration.

At pp. 79-80 of the printed hearings:

> * * * All of the bills that are before the committee today, including the Comptroller General's proposed draft, with the single exception of Representative Celler's bill, add the statement that the decision must be supported by substantial evidence. Now, that will be of very great value to contractors, because it will result in these various department and agencies feeling that *they will have to produce their witnesses at these hearings and permit the contractor to examine them*, in order to have in the record some substantial evidence to support their decisions when they go up on appeal to the court. I do not feel that they will any longer run the risk of refusing to put their proof in the record where it will be exposed to the cross-examination of the contractor. So 3 of the bills which are before the committee today would give that very decided additional advantage. [Italics supplied.]

The foregoing testimony, given before the Committee in January 1954, accurately described the procedure that the Veterans Administration customarily followed, and indeed, which it later followed in the proceedings before the Board in the present case which began on November 14, 1955 (Vol. I of the Transcript).

The Committee on the Judiciary of the House of Representatives later issued its comprehensive report on the purpose and need for the

Wunderlich Act, the same being Report No. 1380, 83d Congress. In recommending legislation that would set aside the decision of the Supreme Court in the Wunderlich case, the Committee said:

> It has been brought to light in public hearings that it is the exception rather than the rule that contractors in the presentation of their disputes are afforded an opportunity to become acquainted with the evidence in support of the Government's position. It is believed that if the standard of substantial evidence is adopted, this condition will be corrected and that the records of hearing officers will hereafter contain all of the testimony and evidence upon which they have relied in making their decisions. It would not be possible to justify the retention of the finality clauses in Government contracts unless the hearing procedures were conducted in such a way as to require each party to present openly its side of the controversy and afford an opportunity of rebuttal. [Emphasis supplied.]

The significant part of this statement by the Committee was that it recognized that the record should contain "all of the testimony and evidence" upon which the Board relied and it emphasized that it would not be possible to justify the retentionof finality clauses in contracts unless the hearing procedures were conducted in such a way as to require each party to present openly its side of the controversy.

In the Bianchi decision, the Supreme Court also referred to the testimony received by the Committee on the Judiciary to the effect that departments and agencies should be required to produce their witnesses at hearings and permit the contractor to examine them. In this connection, it said:

> * * * Indeed with respect to the procedural significance of the substantial evidence test, a leading contractor's representative stated that it would
>
> > "result in these various departments and agencies feeling that they will have to produce their witnesses at these

> hearings and permit the contractor to examine them, in order to have in the record some substantial evidence to support their decisions when they go up on appeal to the court."

The House Report recommending the bill ultimately enacted leaves little doubt that the review intended was one confined to the administrative record. H. R. Rep. No. 1380, 83d Cong., 2d Sess. The explicit references to the Administrative Procedure Act, 60 Stat. 243, 5 U.S.C. §1009, and to this Court's discussion of the standards of review in Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229, are only the least indications. Even more significant is the Committee's view, echoing that of the witness quoted above, that the standards proposed would remedy the practice in many departments of failing to acquaint the contractor with the evidence in support of the Government's position:

> "It is believed that if the standard of substantial evidence is adopted this condition will be corrected and that the records of hearing officers will hereafter contain all of the testimony and evidence upon which they have relied in making their decisions. It would not be possible to justify the retention of the finality clauses in Government contracts unless the hearing procedures were conducted in such a way as to require each party to present openly its side of the controversy and afford an opportunity of rebuttal." H. R. Rep. No. 1380, 83d Cong., 2d Sess. 5.

This sound and clearly expressed purpose would be frustrated if either side were free to withhold evidence at the administrative level and then to introduce it in a judicial proceeding. * * *

The foregoing was a clear condemnation of the procedures being followed by the Veterans Administration Board. Indeed, the Veterans Administration itself in June 1960 recognized the need for reform, and revised the procedures of its Board to permit the receipt of sworn testimony in open hearings. VA Regulation 781 granted new authority to the Board, as follows:

(A) The Board is delegated authority by the Administrator to ascertain the facts and circumstances and to render and publish final decisions on appeals entered by contractors from decisions of VA contracting officers in accordance with contract terms and these regulations.

(B) The Board and its individual members are delegated authority by the Administrator to take such actions as may be necessary to hear and decide appeals including the administering of oaths and affirmations, the taking of testimony and affidavits, the conduct of hearings, the dismissal of proceedings and ordering the production of documents and other evidence.

(C) The Board is authorized to take official notice of facts within general knowledge and to decide all questions necessary for complete adjudication.

In an article which appeared in the Journal of the Bar Association of the District of Columbia, issue of May 9, 1961, by John Alvin Croghan, Esq., the newly constituted trial attorney for the Veterans Administration Board of Contract Appeals, Mr. Croghan, at pp. 240-242, spoke of the earlier practice of the Board to obtain information without the presence of contractor as follows:

> As a corollary to the quoted language it may be remarked that the Board had no duty to communicate to appellant the contents of the evidentiary material thus retroactively obtained -- nor, in fact, any obligation to disclose that such data had been obtained and was being considered.
>
> Speaking for the Court of Appeals in the Wells case, Chief Judge Gardner, referring to appellant, stressed that:
>
> "It was given an opportunity without restriction to present evidence . . . . "
>
> On mature reflection this categorical utterance pales into a verisimilitude.

Of cardinal importance in the time-honored and recognized process of building evidence in a case is the right to confront adverse witnesses and by proper cross examination to bring forth testimonial evidence. Under the rules of the Board extant at the time of the Wells case, no Government witnesses appeared. Inasmuch as the Government case was presented in the form of a documented record whose contents to appellants were not revealed, it was not necessary for the Government to introduce witnesses. Moreover, and most importantly, the then prevailing rules contemplated the personal appearance only of appellant before the Board.

Neither could the appellant obtain evidence through the medium of discovery; the Board's rules sanctioned neither depositions nor interrogatories to accomplish such end.

Inaccuracies in the statement of facts resort to specious reasoning and the isolated status of the case join to suggest that Wells is an unreliable precedent upon which to posit a vindication of the Board's ex parte procedures.

The fact remained that the operation of the Board over an extended period of time was the target of much objurgation.

Particularly objectionable were the procedural regulations which provided that the contracting officer's files and other internal administrative data before the Board would not be available for inspection by appellants. Yet the Board, in reaching its decision, would consider facts taken therefrom which had not been revealed to the appellant, and insisted upon "obtaining and including such further data and evidence as the Board may, in its judgment, consider necessary to a proper adjudication." This permitted the Board, on itsown initiative, to obtain any ex parte statement, letter, or other data for its file and declare it to be part of the "record" without formal introduction and without opportunity afforded for entertaining objections as to the competency or relevancy thereof by either the contractor or the Government.

In the same manner opinion evidence was obtained where the qualifications of the selected expert -- whether he were one of the VA employees or an independent outsider -- was not open to attack on voir dire examination.

Those supporting the Board's former archaic processes contended that the mentioned objectionable characteristics were offset

> by the rebuttal provisions set forth in VAR 755. This, however, was no more than a Parthian shot inasmuch as the latter was a post-hearing proceeding available to appellant only at a time subsequent to the rendition of ultimate findings and conclusions which were based upon evidence previously placed in the arbitrarily constituted record. Of the content of the latter the appellant had no knowledge. The appellant thus was placed in a positionat the time of rebuttal where it must refute matters upon which the Board, after obtaining ex parte statements and performing independent investigations and inquiries, had formed definite opinions, findings and conclusions. The rarity of change or modification after rebuttal is demonstrated by the statistics of the Board which disclose that only 1 of 31 draft decisions was changed by reason of matters presented through appellants' rebuttal briefs.

Plaintiff cannot better state its views with respect to the inadequacies, procedural and otherwise, of the Board's method of hearing and disposing of appeals. The conduct of the Board constituted a Wunderlich defect going to the heart of the administrative process by which plaintiff's claims were adjudged, and accordingly vitiated all of the Board's findings of fact.

### 4. Was the Board's Decision Supported By Substantial Evidence Within The Meaning Of The Wunderlich Act?

Before embarking upon a discussion of whether the Board's decision was supported by substantial evidence within the meaning of the Wunderlich Act, the plaintiff wishes to emphasize that in view of its position under Heading 2 with respect to claims for breach of contract being beyond the jurisdiction of the Board to consider, it is not essential for plaintiff to establish that the findings of fact made in relation to these were not supported by substantial evidence. However, inasmuch as the Commissioner has not yet

ruled on this point, the plaintiff under the present heading will not differentiate between claims within the jurisdiction of the Board and those not within its jurisdiction.

The first basic argument which the plaintiff makes on this subject is that the determination of whether the Board's findings are supported by substantial evidence must be made upon the basis of the evidence that was openly and properly received in the hearings, and not upon informal discussions that the Board had with witnesses after the hearings had closed, or upon the reports which such persons may have made to the Board which were not revealed to the plaintiff until after the Board had reached its conclusion and had rendered its decision.

From what has gone before, it is clear that both Congress and the Supreme Court have condemned the practice of the Board of obtaining information in such a way that contractors were not permitted to confront the persons supplying such information and cross-examine them. It therefore follows that information and advice of this nature has no legitimate place in the administrative record and consequently should not be used as a basis for supporting the accuracy or reasonableness of any conclusions of the Board based thereon.

Without these reports, the only evidence before the Board will consist of the testimony of the plaintiff's witnesses, both on direct examination and as cross-examined by the Board, as well as the many exhibits which

were prepared and offered for the Board's consideration during the hearing. The necessity, or even desirability, of attempting to set forth in this Memorandum all of the pertinent factual conclusions pertaining to the plaintiff's claim, as supported by the various witnesses, is not apparent in view of the fact that this has already been accomplished in most minute detail in the plaintiff's brief before the Board, which appears as Exhibit 7 to the Board's findings. The plaintiff accordingly adopts, and includes herein by reference, the factual statements and supporting citations which appear from pp. 5 through 288 of plaintiff's brief before the Board. All of these statements of fact are fully supported by testimony and exhibits received in open hearing. There is no acceptable proof to the contrary. As these statements are at complete variance with the conclusions reached by the Board in disallowing the plaintiff's claims, it necessarily follows that the Board's conclusions are not supported by substantial evidence.

While plaintiff believes that the foregoing position is well taken, it is not content to permit the Board's findings to stand without demonstrating that they are not supported by substantial evidence even on the basis of all of the additional information which the Board obtained under the objectionable circumstances hereinbefore related. In the pages that follow, plaintiff will accordingly, as an alternative position to be adopted only in the event that the Commissioner should reject its first contention, review the findings of the Board in order to indicate why they were not supported by substantial evidence.